900 F.2d 587
 59 Ed. Law Rep. 988
 Professor Ernest F. DUBE, Professor William McAdoo,
Professor Amiri Baraka, Professor Carolle Charles, Professor
Leslie Owens, Haitian Student Organization, Latin American
Student Organization International Student Organization,
Caribbean Student Organization, and Third World Resources, Plaintiffs,
Professor Ernest F. Dube, Plaintiff-Appellee,
v.
The STATE UNIVERSITY OF NEW YORK, Clifton R. Wharton, Jr.,
Ex-Chancellor of the State University of New York,
individually and in his official capacity; Jerome Komisar,
Acting Chancellor of the State University of New York,
individually and in his official capacity; John Marburger,
President of the State University of New York at Stony
Brook, individually and in his official capacity; Homer A.
Neal, Provost of the State University of New York at Stony
Brook, individually and in his official capacity; Robert
Neville, Dean of Humanities and Fine Arts at the State
University of New York at Stony Brook, individually and in
his official capacity, Defendants-Appellants.
 No. 885, Docket 88-7980.
 United States Court of Appeals,
Second Circuit.
 Argued March 17, 1989.
Decided April 12, 1990.
 
 Kathie Ann Whipple, Asst. Atty. Gen., State of N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., O. Peter Sherwood, Sol. Gen., Ellen Fried, Asst. Atty. Gen., State of N.Y., New York City, of counsel), for defendants-appellants.
 Frank E. Deale, Center for Constitutional Rights (Wilhelm Joseph, National Conference of Black Lawyers, Lennox S. Hinds, Aaron D. Frishberg, Stevens, Hinds & White, New York City, of counsel), for plaintiffs-appellees.
 Before MESKILL, MINER and MAHONEY, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an interlocutory appeal from an order of the United States District Court for the Eastern District of New York, Mishler, J., granting in part and denying in part defendants-appellants' motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), and denying their motion for summary judgment pursuant to Fed.R.Civ.P. 56.
 
 
 2
 The litigation was commenced by plaintiff-appellee Ernest F. Dube, a former assistant professor at the State University of New York at Stony Brook (Stony Brook), and others against defendants-appellants, the State University of New York (SUNY) and various SUNY officials, in their individual and official capacities, seeking monetary damages and injunctive relief pursuant to 42 U.S.C. Sec. 1983.[1] In his complaint, Dube alleges that he was denied tenure in violation of his First Amendment rights, "based on [his] discussion of controversial topics in his classroom," and that he was denied due process of law in the tenure review process, in violation of his Fourteenth Amendment rights. Dube also pleads two pendent state law claims.
 
 
 3
 Defendants moved for (1) judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) on the ground that Eleventh Amendment immunity barred suit against SUNY and the individual defendants acting in their official capacities, and (2) summary judgment pursuant to Fed.R.Civ.P. 56. The district court granted the motion for judgment on the pleadings "except as to prospective relief for reinstatement." We modify this aspect of the district court's order to preclude any relief against SUNY, and any injunctive relief on Dube's state law claims, and, as modified, affirm.
 
 
 4
 The district court, however, denied defendants' motion for summary judgment, ruling that (1) genuine issues of material fact exist with respect to whether Dube was denied tenure because of the content of his classroom discourse, and (2) the individual defendants' claims of qualified immunity should not preclude a trial on the merits. Because we conclude that a genuine dispute exists as to the subjective motivation of all individual defendants except Komisar, we affirm the denial of summary judgment on the merits and order the district court to enter summary judgment in Komisar's favor on all claims. Furthermore, as we conclude that Dube has failed to allege a protected "liberty" or "property" interest, we order the district court to (1) dismiss Dube's Fourteenth Amendment claim, and, consequently, (2) dismiss as moot defendants' claim of qualified immunity from section 1983 liability on the Fourteenth Amendment claim. The denial of qualified immunity as to the individual defendants in their personal capacities with respect to the alleged First Amendment violation is affirmed.
 
 BACKGROUND
 
 5
 Dube was hired by Stony Brook in 1977 as an assistant professor in its Africana Studies Program. He had come to the United States in 1967 after being expelled from his native South Africa for his outspoken opposition to apartheid. Before joining the Stony Brook faculty, Dube received a B.S. in psychology and sociology from the University of Natal in South Africa, and a Ph.D. in cognitive psychology from Cornell University. Dube's employment was governed both by the Policies of the SUNY Board of Trustees (the Policies) and by a collective bargaining agreement between United University Professions, Inc. (UUP), agent for Stony Brook professors, and the State of New York (the Agreement).
 
 
 6
 In the fall term of 1981, Dube began teaching a course in the Africana Studies Program designated AFS/POL 319, "The Politics of Race." A description of this course, apparently prepared by Dube for the summer term of 1983, made reference to "[t]he three forms of racism and how they manifested themselves: 1) Nazism in Germany[,] 2) Apartheid in South Africa[, and] 3) Zionism in Israel." A similar description for the fall 1983 term stated: "We will ... end up by discussing the three main forms of racism: overt racism, covert racism, and reactive racism. Examples of all three forms of racism will be discussed for comparative purpose[s]; e.g., Nazism, apartheid, and Zionism."
 
 
 7
 Dube's complaint alleges that on July 15, 1983, Professor Selwyn Troen, a visiting professor from Ben Gurion University of the Negev in Israel, wrote a letter to Egon Neuburger, Dean of the College of Arts and Sciences at Stony Brook, in which Troen asserted that Dube, in AFS/POL 319, taught that "Zionism is as much racism as Nazism was racism and that 'the class was asked to share the instructor's view that there is an identity between the two.' " Troen's letter also allegedly accused Dube of using his position for the " 'propagation of personal ideology and racist biases.' " Copies of this letter were allegedly sent to defendant-appellant Homer Neal, Provost of Stony Brook, Vice-Provost Spanier, fourteen members of the Stony Brook faculty, and the news media.
 
 
 8
 In a written response to these allegations, Dube, on July 27, 1983, allegedly stated that
 
 
 9
 he had exposed his class to his own view that Zionism was not a monolithic ideology, but that among organizations and individuals identifying themselves as Zionists there were both groups with histories of espousing racist views and others who were not racist, and [he] had urged his students to avoid simplistic and stereotyped thinking.
 
 
 10
 The matter was subsequently investigated by the Executive Committee of the Stony Brook Senate, which unanimously determined Dube's teachings to be within the bounds of academic freedom. During August and September of 1983, the committee's position was ratified by Dean Neuberger, defendants-appellants Neal and John Marburger, President of Stony Brook, and the full University Senate by a vote of 55-14. This ratification, however, did not quell the growing furor.
 
 
 11
 Thereafter, the Long Island branch of the Anti-Defamation League of B'nai Brith and the American Jewish Committee allegedly "mounted a publicity and lobbying campaign directed at President Marburger, with an express aim to cause the University to repudiate Dr. Dube and to discontinue his teaching of 'The Politics of Race,' AFS/POL 319." Long Island Assemblyman Lewis Yevoli allegedly threatened to block funding for the Africana Studies Program in the Ways and Means Committee of the New York State Assembly if Dube was allowed to continue teaching AFS/POL 319, and New York Governor Mario Cuomo allegedly issued a statement condemning "the failure of the University community to denounce Dr. Dube." Marburger also received letters from Stony Brook alumni stating that they were discontinuing financial contributions and urging students not to enroll.
 
 
 12
 As a result of the controversy concerning AFS/POL 319, Marburger, on October 19, 1983, issued the following statement:
 
 
 13
 In view of the continuing concern regarding the position of the administration of the State University of New York at Stony Brook with respect to the course "The Politics of Race" taught by Professor Dube, I wish to clarify and reiterate that position so there will be no doubts about it.
 
 
 14
 The Stony Brook administration, for which I speak officially here, absolutely divorces itself from the views expressed in this course, and from any view that links Zionism with racism or nazism. Furthermore, I personally find such linkages morally abhorrent.
 
 
 15
 Several events have occurred subsequent to the incident that drew attention to Professor Dube's course that some have interpreted as implying a pattern of antisemitic behavior at Stony Brook. These events are each of them unfortunate, but in my opinion are unrelated to each other and to the course taught by Professor Dube.[2]
 
 
 16
 AFS/POL 319 was thereafter removed from the course listings of the political science department.
 
 
 17
 Dube became eligible for tenure during the 1983-84 academic year. However, due to the ongoing controversy surrounding AFS/POL 319, he requested, and was granted, a postponement of tenure review until the 1984-85 academic year. At that time, an ad hoc review committee was appointed to consider the matter and to provide a recommendation regarding Dube's potential tenure. No faculty member who, in Dube's view, had been allied with Troen in protesting Dube's teachings was appointed to the committee.
 
 
 18
 Upon review of Dube's publication record, university service, teaching evaluations and peer recommendations, the committee voted 6-1 in favor of recommending tenure, and 4-3 in favor of recommending promotion to associate professor. Although the committee acknowledged that "much of Professor Dube's expertise ... has not been written down," that he "does not easily fit the 'mold' of the 'traditional' academic," and that consideration of his "life experiences" was necessary to obtain a "rounded assessment of his accomplishments," it nevertheless found Dube to be "an exciting, valuable, and not replaceable resource to Africana Studies, students, and the university community."
 
 
 19
 In accordance with established procedures, the matter was then reviewed by the Personnel Policy Committee, a standing committee elected by the faculty of the Stony Brook College of Arts and Sciences. By a vote of 4-3 this committee also recommended a grant of tenure, but unanimously voted against recommending promotion. The committee chairman's report to the Dean stated, in pertinent part:
 
 
 20
 There was general agreement that both the quantity and quality of written scholarship was short of the usual standards. Accordingly, there was in our discussion very little support for promotion. Fairness both to other candidates and to the scholarly goals of the University require that we recommend against promotion for the level of scholarly activity reflected by this record.
 
 
 21
 The matter was next considered by defendant-appellant Robert Neville, Dean of Humanities and Fine Arts at Stony Brook, who recommended that Dube be denied tenure and promotion. In Neville's opinion, Dube's publications were both less numerous than that generally required for tenure at Stony Brook, and did not evidence "the mature development of an intellectual project which we look for in granting faculty tenure." Neville was also of the opinion that
 
 
 22
 Africana studies has not yet fulfilled its potential or accomplished its mission at Stony Brook. It needs greatly to elaborate its relations with other departments.... Professor Dube's apparent withdrawal from academic psychology is not helpful. Africana Studies also needs to become a department and develop a graduate program in conjunction with other departments; Professor Dube's scholarly posture would be a hindrance here.
 
 
 23
 Upon receipt and review of all materials accumulated to that point, including Neville's recommendation, Neal then recommended denying both tenure and promotion. In a memorandum to Marburger, dated July 1, 1985, Neal stated that the Personnel Policy Committee's recommendation to grant tenure without promotion was "in exception to standard practice." Provost Neal also expressed his belief that "[c]ontinuing appointment at a major research university is warranted only when an individual has taken his or her unique experiences, training, background and insights and prodigiously translated them into a form, based on the rigors of scholarly traditions, that can be read and shared by scholars for generations to come." He concluded that Dube had not met that standard because "Dr. Dube's publication record is extremely limited."
 
 
 24
 President Marburger concurred, and recommended denial of both tenure and promotion. In a letter to Dube, dated August 30, 1985, Marburger not only outlined the specific deficiencies in Dube's scholarly record, but also explained that the negative recommendations from Neville and Neal reflected their assignment of greater weight to scholarship, rather than a contradiction of the findings of the faculty committees.
 
 
 25
 Dube immediately appealed Marburger's decision and sought review by then SUNY Chancellor, defendant-appellant Clifton Wharton, Jr. Pursuant to Article 33 of the Agreement, an advisory committee was appointed as follows: Dube and Marburger each selected one committee member, and those members then selected a third individual to serve as the committee's chair. After reviewing all relevant materials, the advisory committee unanimously recommended granting tenure without promotion. The committee report described Dube as "a good teacher [who] gives a great deal of himself to students on an informal basis, as an advisor, and in directing independent study and readings." The committee also noted Neville's admiration for Dube as a "cultural resource," and Neville's observation that "few people now in the Western world have been as involved as [Dube] in the affairs of Africa."
 
 
 26
 However, before Wharton was able to render a decision, the advisory committee's report was disclosed to the press and to the American Association of University Professors (AAUP), a labor organization in competition with the UUP, who urged that Dube be tenured. In response to what, in Wharton's opinion, "represented a breach of ... the basic principles of confidentiality inherent in the tenure review process," he deemed it necessary to convene a second advisory committee prior to rendering his decision. During the interim, Dube's appointment was extended through February 28, 1987.
 
 
 27
 The second advisory committee, appointed via the same procedure as its predecessor, recommended that Dube be granted tenure without promotion or, in the alternative, that his contract be extended for three years, with tenure and promotion to be considered during the third year. The committee noted that "Professor Dube's publication record has been below the levels normally considered adequate for promotion and tenure at SUNY/Stony Brook," but also observed that "the problems that relate to his teaching about racism certainly interfered with his research and writing activities."
 
 
 28
 However, by letter, dated January 30, 1987, Wharton informed Dube of his decision to deny Dube tenure at Stony Brook. Wharton stated that research and publication must be weighted more heavily at a graduate/research comprehensive university such as Stony Brook than at undergraduate universities, and that Dube's record had justifiably been found to be deficient by Stony Brook standards. Wharton also acknowledged the likelihood that the tenure decision would be viewed as tainted by the controversy concerning Dube's teaching, stating:
 
 
 29
 If an adverse tenure decision is made, your critics will claim that it is a vindication of their charge of impropriety in your teaching and your advocates will claim that the decision was based upon racial/religious biases. If a positive tenure decision is made, your critics will claim that it represents a reaffirmation of the content of your teaching and your advocates will claim a victory against racial/religious bigotry and for the content of your teaching. In neither case will the true bases of the decision be seen as the traditional ones, that is, the quality of your performance in teaching, research and public service.
 
 
 30
 Accordingly, Dube's appointment at Stony Brook was to be terminated on August 31, 1987.
 
 
 31
 On February 1, 1987, defendant-appellant Jerome Komisar succeeded Wharton as Acting Chancellor of SUNY. As Acting Chancellor, Komisar took no action with respect to Dube's candidacy for tenure, except to inform the AAUP by letter, dated March 9, 1987, that "there is simply no basis for intervention by AAUP in SUNY's collectively-negotiated tenure procedure."
 
 
 32
 Dube filed suit under 42 U.S.C. Sec. 1983, on May 19, 1987, seeking compensatory and punitive damages against the individual defendants in their individual capacities, and a permanent injunction that would require defendants to appoint Dube to a tenured position at Stony Brook.[3] The complaint pleaded four causes of action: first, "Chancellor Wharton's denial of tenure and of a continuing appointment at Stony Brook violated Dr. Dube's right to free speech guaranteed by the First Amendment" because it was "based on Dr. Dube's discussion of controversial topics in his class room;" second, "Wharton's distortion of the Chancellor's review process in an attempt to obtain a recommendation adverse to Dr. Dube, his aborting of the Chancellor's review process, and his unilateral decision to deny Dr. Dube tenure based on reasons irrelevant to the tenure criteria established by the university, deprived Dr. Dube of due process of law, guaranteed by the Fourteenth Amendment;" third, "Chancellor Wharton's deliberate disregard of the recommendations of the Review Committees and refusal to make a tenure decision in good faith after consideration of the Review Committees' reports violated Dr. Dube's rights under [ (1) ] the contractual agreement between the University and the U.U.P.... [, and (2) ] the guarantee in the University-UUP agreement of the full freedom of faculty members to discuss their own subjects in the classroom without limitation;" and fourth, "[t]he denial to Dr. Dube of continued employment and tenure at Stony Brook is arbitrary and capricious, and violates the Constitution of the State of New York, the New York Civil Service Law, and the policies adopted by the Trustees of the State University of New York."
 
 
 33
 Defendants moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), and for summary judgment pursuant to Fed.R.Civ.P. 56, raising claims of Eleventh Amendment immunity from suit and qualified immunity--the primary concerns of this appeal. In affidavits submitted in support of the motion for summary judgment, each of the individual defendants, except Komisar, stated that his recommendation concerning Dube's tenure and promotion was based solely on the academic merits, and that the controversy concerning AFS/POL 319 was not a factor in the decision. Each affidavit also noted the specific academic considerations taken into account in arriving at the recommendation in question. Komisar provided an affidavit stating that he became Acting Chancellor after Wharton issued his decision denying Dube's appeal, and had no occasion to ratify, enforce or reconsider that decision.
 
 
 34
 Concluding that the Eleventh Amendment barred Dube's claims for monetary damages against both SUNY and the individual defendants in their official capacities, the district court dismissed those claims pursuant to Fed.R.Civ.P. 12(c) "except as to prospective relief for reinstatement." However, the motion for summary judgment, which sought "dismissal of claims against defendants in their individual capacit[ies]," was denied in total. With respect to Dube's First Amendment claim, the district court found that "[t]he trier of the facts may reasonably infer that 'but for' the exercise of his First Amendment right of free speech Dr. Dube would have been granted tenure." As to Dube's Fourteenth Amendment claim, the court found that "the same outside pressures" alleged to have infringed upon Dube's First Amendment rights may also have "interfered with his right to a fair hearing." No separate analysis was undertaken with respect to Dube's state law claims.
 
 
 35
 Finally, without addressing the issue of qualified immunity in the context of either constitutional claim asserted, the district court nevertheless denied defendants' motion for summary judgment based on their defense of qualified immunity. Noting that "[t]he relationship between the exercise of Dr. Dube's First Amendment rights [in the summer of 1983] and denial of tenure [in January 1987] appear to be distant both in time and subject matter," the court simply concluded:
 
 
 36
 The defense that defendants had a good faith belief of reasonable university officials that the denial of tenure was "based on Dr. Dube's file and the standards applicable at Stony Brook and in light of clearly established law" ... is not an answer to Dr. Dube's claim. Summary judgment is therefore denied based on the qualified immunity defense
 
 
 37
 ....
 
 
 38
 The evidence which defendants offer on the issue of qualified immunity may be offered in answer to Dr. Dube's claim as the reason for denying tenure. Defendants will have the opportunity of showing "that it would have reached the same decision as to [Dr. Dube's tenure] even in the absence of [the controversy over the subject matter of his course]." Mt. Healthy City School Dist. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 ... (1977).
 
 
 39
 Defendants now appeal from "each and every part" of the district court's order denying their motion for judgment on the pleadings and summary judgment "[that] is adverse to [them]."DISCUSSION
 
 A. Eleventh Amendment Immunity
 
 40
 Pursuant to what has become known as the "collateral order" doctrine, see Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949), the denial of a motion to dismiss claims on absolute Eleventh Amendment immunity grounds is immediately appealable under 28 U.S.C. Sec. 1291 if the immunity defense can be decided solely as a matter of law.[4] United States v. Yonkers Board of Educ., 893 F.2d 498, 502-03 (2d Cir.1990); see Eng v. Coughlin, 858 F.2d 889, 894 (2d Cir.1988); Minotti v. Lensink, 798 F.2d 607, 608 (2d Cir.1986), cert. denied, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987). Appellants contend that the ruling of the district court that granted dismissal of Dube's claim for all relief against SUNY and the defendants in their official capacities except for "prospective relief of reinstatement" should be broadened to bar both Dube's claim against SUNY for reinstatement and his pendent state law claims. We agree, and therefore modify the order of the district court to direct dismissal of all claims against SUNY, and to preclude any injunctive relief against the individual defendants in their official capacities on Dube's state claims.
 
 
 41
 The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." As we noted in Dwyer v. Regan, 777 F.2d 825 (2d Cir.1985), modified, 793 F.2d 457 (2d Cir.1986):
 
 
 42
 The Supreme Court has consistently held that the federal courts lack jurisdiction not only over suits against a state brought by citizens of other states, as the literal language of the Amendment provides, but also over suits against such states brought by their own citizens. Thus, it is clear that, with few exceptions, federal courts are barred from entertaining suits brought by a private party against a state in its own name.
 
 
 43
 Id. at 835 (citations omitted); see Papasan v. Allain, 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986). Although Congress is empowered under section five of the Fourteenth Amendment to override Eleventh Amendment immunity and "to enforce 'by appropriate legislation' the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority," Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976); see Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242-43, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985); Dwyer, 777 F.2d at 835, it is well settled that 42 U.S.C. Sec. 1983 does not constitute an exercise of that authority. Quern v. Jordan, 440 U.S. 332, 340-42, 99 S.Ct. 1139, 1144-45, 59 L.Ed.2d 358 (1979). Therefore, since Dube's federal causes of action are brought under section 1983, "in the absence of consent[, any claims against] the State or one of its agencies or departments ... [are] proscribed by the Eleventh Amendment." Pennhurst State School and Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). "This bar exists whether the relief sought is legal or equitable." Papasan, 478 U.S. at 276, 106 S.Ct. at 2939.
 
 
 44
 For Eleventh Amendment purposes, SUNY "is an integral part of the government of the State [of New York] and when it is sued the State is the real party." State Univ. of New York v. Syracuse Univ., 285 A.D. 59, 61, 135 N.Y.S.2d 539, 542 (3d Dep't 1954). Furthermore, SUNY has clearly not consented to suit in a federal forum. Thus, no relief, either legal or equitable, is available against SUNY. See Fox v. Board of Trustees, 649 F.Supp. 1393, 1397 (N.D.N.Y.1986), rev'd on other grounds, 841 F.2d 1207 (2d Cir.1988), rev'd, --- U.S. ----, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); Williams v. State Univ. of New York, 635 F.Supp. 1243, 1249-50 & n. 4 (E.D.N.Y.1986); Lachica v. Jaffe, 578 F.Supp. 83, 84-85 (E.D.N.Y.1983). Accordingly, SUNY's motion to dismiss should have been granted in full.
 
 
 45
 On the other hand, a state official acting in his official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar. Papasan, 478 U.S. at 276-77, 106 S.Ct. at 2939; Pennhurst, 465 U.S. at 102, 104 S.Ct. at 909; Hutto v. Finney, 437 U.S. 678, 692, 98 S.Ct. 2565, 2574, 57 L.Ed.2d 522 (1978); Ex parte Young, 209 U.S. 123, 159-60, 28 S.Ct. 441, 453-54, 52 L.Ed. 714 (1908); see Edelman v. Jordan, 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974) ("a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief ... and may not include a retroactive award which requires the payment of funds from the state treasury"). However, a federal court's grant of injunctive relief against a state official may not be based on violations of state law. See Pennhurst, 465 U.S. at 106, 104 S.Ct. at 911. Accordingly, the district court's order must be modified to preclude any injunctive relief against the defendants acting in their official capacities on the basis of Dube's state law claims.
 
 
 46
 Finally, we note that the conclusions derived from our Eleventh Amendment analysis are reinforced by a recent Supreme Court ruling interpreting 42 U.S.C. Sec. 1983 in a non-Eleventh Amendment context. In Will v. Michigan Department of State Police, --- U.S. ----, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Court held that "neither a State nor its officials acting in their official capacities are 'persons' under Sec. 1983," and thus are not subject to liability for deprivations of constitutional rights thereunder. Id. 109 S.Ct. at 2312. However, this holding was qualified with the statement that "a State official in his or her official capacity, when sued for injunctive relief, would be a person under Sec. 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' " Id. 109 S.Ct. at 2311 n. 10 (quoting Kentucky v. Graham, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985)).
 
 
 47
 The Eleventh Amendment, however, provides no immunity for state officials sued in their personal capacities. See Farid v. Smith, 850 F.2d 917, 920-23 (2d Cir.1988). We therefore turn now to defendants' claims of qualified immunity.
 
 B. Qualified Immunity
 1. Jurisdiction
 
 48
 As in the case of the partial denial of defendants' Eleventh Amendment defense, the propriety of their interlocutory appeal from the denial of their motion for summary judgment on the issue of qualified immunity is governed by the "collateral order" doctrine. See Cohen, 337 U.S. at 546, 69 S.Ct. at 1225. Under the criterion articulated by the Supreme Court in Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. Sec. 1291 notwithstanding the absence of a final judgment." Id. at 530, 105 S.Ct. at 2817. Dube contends, inter alia, that the existence of significant factual disputes precludes the exercise of appellate jurisdiction over the district court's denial of defendants-appellants' motion for summary judgment on the issue of qualified immunity. Appellants, on the other hand, argue that the collateral order doctrine "squarely support[s]" the present appeal. Although we conclude that the denial of appellants' qualified immunity defense is subject to immediate interlocutory review under the rule of Mitchell v. Forsyth, we do so based on the district court's failure to address the immunity defense on either Dube's First or Fourteenth Amendment claims.
 
 
 49
 Judge Mishler found that Dube's constitutional claims raised sufficient issues of fact to preclude summary judgment for the defendants. With respect to Dube's First Amendment claim, the district court concluded: "The trier of the facts may reasonably infer that 'but for' the exercise of his First Amendment right of free speech Dr. Dube would have been granted tenure." With respect to Dube's Fourteenth Amendment claim, the court similarly concluded that
 
 
 50
 if Dr. Dube sustains his claim that he was denied tenure because of the controversy over the exercise of his constitutional right of free expression, it may support his claim of the violation of his right to due process in that the same outside pressures interfered with his right to a fair hearing.
 
 
 51
 However, turning to defendants' qualified immunity defense, Judge Mishler inexplicably reasoned:
 
 
 52
 Dr. Dube neither claims that a denial of tenure violated his constitutional rights nor that the denial of tenure was in retaliation for the exercise of his First Amendment rights. We understand his theory of liability to rest on a claim that the university, through its President and Chancellor, failed to exercise the authority with which it was vested and permitted community outrage over the exercise of his First Amendment rights to deny him tenure. The defense that defendants had a good faith belief of reasonable university officials that the denial of tenure was "based on Dr. Dube's file and the standards applicable at Stony Brook and in light of clearly established law" ... is not an answer to Dr. Dube's claim. Summary judgment is therefore denied based on the qualified immunity defense.
 
 
 53
 Thus, even though Dube's complaint squarely presented both First and Fourteenth Amendment claims, we are unable to conclude that the district court addressed the qualified immunity defense on either constitutional claim. Viewed in the context of the quoted cryptic paragraph, the mere statement that "[s]ummary judgment is ... denied based on the qualified immunity defense" is insufficient to dictate a contrary conclusion. Consistent with past precedent, we therefore hold that the denial of defendants' motion for summary judgment on the issue of qualified immunity is immediately appealable. See Musso v. Hourigan, 836 F.2d 736, 741 (2d Cir.1988) ("interlocutory review is appropriate when a district court denies a motion for summary judgment without addressing a proffered qualified immunity defense").[5]
 
 2. Analysis
 
 54
 It is well established that qualified immunity shields government officials performing discretionary functions from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Thus, the existence of immunity "turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting Harlow, 457 U.S. at 819, 818, 102 S.Ct. at 2738, 2738).
 
 
 55
 As discussed previously, although Judge Mishler found that Dube's First and Fourteenth Amendment claims raised sufficient issues of fact to preclude summary judgment for the defendants, he did not consider defendants' qualified immunity defenses to those claims. Since we conclude that Dube has failed to assert a protected "liberty" or "property" interest, see infra Section C, defendants' claim of qualified immunity from section 1983 liability on Dube's Fourteenth Amendment claim is dismissed as moot. However, applying well settled summary judgment standards to defendants' claim of qualified immunity from section 1983 liability on Dube's First Amendment claim, we hold that the immunity defense must fail as a matter of law.
 
 
 56
 At the threshold, we note that under Fed.R.Civ.P. 56, "factual allegations in the pleadings of the party opposing the motion for summary judgment, if supported by affidavits or other evidentiary material, should be regarded as true by the district court." Burtnieks v. City of New York, 716 F.2d 982, 983-84 (2d Cir.1983); see Musso, 836 F.2d at 742-43; First Nat'l Bank of Cincinnati v. Pepper, 454 F.2d 626, 629 (2d Cir.1972). Furthermore, while our review of the record on appeal is de novo, see H.L. Hayden Co. v. Siemens Medical Sys., Inc., 879 F.2d 1005, 1011 (2d Cir.1989), all "inferences to be drawn from the [underlying] facts contained in the affidavits, attached exhibits, and depositions submitted below ... must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); see Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); Giacalone v. Abrams, 850 F.2d 79, 85-86 (2d Cir.1988); Hawkins v. Steingut, 829 F.2d 317, 319 (2d Cir.1987); Burtnieks, 716 F.2d at 985; Kletschka v. Driver, 411 F.2d 436, 440 (2d Cir.1969). See generally 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2716, at 643-46 (2d ed. 1983) ("The message is clear; the party who defended against the motion for summary judgment will have the advantage of the [appellate] court's reading the record in the light most favorable to him, will have his allegations taken as true, and will receive the benefit of the doubt when his assertions conflict with those of the movant.") (footnotes omitted). With these precepts in mind we turn to the defendants' claim of qualified immunity from section 1983 liability on Dube's First Amendment claim.
 
 
 57
 Without expressing any opinion on the merits of Dube's claims, we believe that Dube has proffered evidence from which a jury could find that defendants denied tenure and promotion to him in response to pressure exerted by government officials and community activists outraged by his teachings. We note, simply by way of example, both the Marburger statement, dated October 19, 1983, which "absolutely divorce[d]" the Stony Brook administration from the views expressed by Dube in AFS/POL 319, and Wharton's letter to Dube, dated January 30, 1987, which certainly established that the controversy concerning Dube's teaching about Zionism was on Wharton's mind during his decision-making process. This and other evidence, viewed in the light most favorable to Dube and in the context of the public protests and threats to defund Stony Brook programs, could lead a reasonable jury to find that Dube was denied tenure as a result of the controversy surrounding his teaching. For purposes of this appeal, therefore, we take Dube's assertion of retaliatory motive as true.
 
 
 58
 Thus, in the procedural context of summary judgment, the relevant inquiry on review is reduced to whether the defendants are immune from suit if the facts are as asserted by Dube--i.e., whether, in light of clearly established law, it was objectively reasonable for SUNY officials to believe that denying tenure to Dube in retaliation for the exercise of his First Amendment rights was lawful. See Anderson, 483 U.S. at 641, 107 S.Ct. at 3039; Dobosz v. Walsh, 892 F.2d 1135, 1141 (2d Cir.1989); Musso, 836 F.2d at 742-43. This purely legal question, which conclusively determines the issue of qualified immunity, must be answered in the negative, as the facts alleged by Dube unequivocally support his claim of violation of long-standing and clearly established First Amendment law.
 
 
 59
 In this regard, we need only note that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). The Supreme Court has repeatedly emphasized the importance of the classroom as the "marketplace of ideas," stating in Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957):
 
 
 60
 The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.... Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.
 
 
 61
 Id. at 250, 77 S.Ct. at 1211.
 
 
 62
 Thus, while we recognize that courts should accord deference to academic decisions, see Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985); Clements v. County of Nassau, 835 F.2d 1000, 1004-05 (2d Cir.1987), for decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation "that cast a pall of orthodoxy" over the free exchange of ideas in the classroom. Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967); cf. Mt. Healthy City School Dist. Board of Educ. v. Doyle, 429 U.S. 274, 283-84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); Board of Regents v. Roth, 408 U.S. 564, 574-75 & n. 14, 92 S.Ct. 2701, 2708 & n. 14, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 596-98, 92 S.Ct. 2694, 2696-98, 33 L.Ed.2d 570 (1972); Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). We therefore conclude that, assuming the defendants retaliated against Dube based on the content of his classroom discourse, such conduct was, as a matter of law, objectively un reasonable. Cf. Krause v. Bennett, 887 F.2d 362, 371-72 (2d Cir.1989) (holding defendant New York state trooper's determination to arrest plaintiff objectively reasonable, as a matter of law). Accordingly, the defendants are not qualifiedly immune from section 1983 liability on Dube's First Amendment claim.
 
 
 63
 The practical effect of this ruling is twofold: first, Dube's First Amendment claim will proceed to trial and, as Judge Mishler observed, defendants may defend against that claim on the merits by contending that they denied tenure and promotion to Dube for permissible academic reasons, without regard to community pressure triggered by Dube's teaching on Zionism and racism, and that the controversy resulting from that teaching did not affect the outcome of the decision regarding tenure and promotion, see Mt. Healthy, 429 U.S. at 287, 97 S.Ct. at 576; and, second, the defense of qualified immunity is removed from the case.
 
 C. Non-immunity Questions
 
 64
 As indicated earlier, appellate jurisdiction in this case is premised on the denial of defendants' Eleventh Amendment immunity and qualified immunity defenses. However, having jurisdiction of the appeal, we have discretion to consider other arguments, not on their own meriting interlocutory review under Cohen, "where there is sufficient overlap in the factors relevant to the appealable and nonappealable issues to warrant our exercising plenary authority." United States v. Gerena, 869 F.2d 82, 84 (2d Cir.1989); see American Motorists Ins. Co. v. United Furnace Co., 876 F.2d 293, 302 (2d Cir.1989) (otherwise unappealable denial of summary judgment reviewed in interests of judicial economy); San Filippo v. U.S. Trust Co., 737 F.2d 246, 255 (2d Cir.1984) (same), cert. denied, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985). In the interests of judicial economy we therefore exercise our pendent appellate jurisdiction and entertain several nonappealable yet "overlapping" issues.
 
 
 65
 With respect to Dube's First Amendment claim, which alleges a denial of tenure "based on [his] discussion of controversial topics in his classroom," we agree with the district court that a genuine issue of material fact exists regarding the defendants' subjective motivation. The defendants' motion for summary judgment on the merits of Dube's First Amendment claim was therefore properly denied.[6] See Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir.1984) (summary judgment typically inappropriate "where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated"). See generally 10A C. Wright, A. Miller & M. Kane, supra, Sec. 2732.
 
 
 66
 On the other hand, Dube's Fourteenth Amendment claim, which asserts a lack of procedural due process in the promotion and tenure review procedure, must fail. We simply note that even though Dube alleges that Wharton's distortion of the review procedure deprived him of due process of law, any constitutional constraints on SUNY's review procedure necessarily depend on whether the interest asserted by Dube falls within the Fourteenth Amendment's protection of "liberty" or "property." See Perry, 408 U.S. at 599-603, 92 S.Ct. at 2698-2700; Roth, 408 U.S. at 569-78, 92 S.Ct. at 2705-09; see also Mt. Healthy, 429 U.S. at 283, 97 S.Ct. at 574. For example, a claim to tenure constitutes a protected property interest only if it amounts to a "legitimate claim of entitlement" thereto. Roth, 408 U.S. at 577, 92 S.Ct. at 2709. Based on the record before us, which indicates only that Dube was entitled to be considered for tenure in accordance with established contractual procedures, we conclude that Dube has failed to meet the threshold requirement of establishing a protected "liberty" or "property" interest.[7] See Clemente v. United States, 766 F.2d 1358, 1364-65 (9th Cir.1985) (procedural requirements, which provided no significant restrictions on decision-maker or articulable standards to guide his discretion, held not to establish Fourteenth Amendment property interest), cert. denied, 474 U.S. 1101, 106 S.Ct. 881, 88 L.Ed.2d 917 (1986); Siu v. Johnson, 748 F.2d 238, 243 n. 11 (4th Cir.1984) (established procedures relating to tenure review held not to constitute Fourteenth Amendment property interest); Shango v. Jurich, 681 F.2d 1091, 1101 (7th Cir.1982) (state created procedural right held not to constitute Fourteenth Amendment liberty interest); Bills v. Henderson, 631 F.2d 1287, 1298-99 (6th Cir.1980) (procedural rules created by state administrative bodies held not to establish protected Fourteenth Amendment liberty interest); Jones v. Kneller, 482 F.Supp. 204, 210 (E.D.N.Y.1979) (contractual right of tenure review and confrontation held not to give rise to Fourteenth Amendment property interest), aff'd mem., 633 F.2d 204 (2d Cir.), cert. denied, 449 U.S. 920, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980). But see Skehan v. Board of Trustees, 590 F.2d 470, 485 (3d Cir.1978) (professor seeking tenure held to have property interest in procedures established by college's statement of policy), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979). We therefore direct dismissal of Dube's Fourteenth Amendment claim in its entirety.
 
 
 67
 We also find no support for any claim against Komisar, who succeeded Wharton as Acting Chancellor after Wharton made his final decision concerning the Dube matter. Komisar merely responded to a letter from the AAUP that requested reconsideration of the Dube situation by writing that, in view of the Agreement between SUNY and UUP, "there is simply no basis for intervention by AAUP." This alleged "ratification and enforcement" of Wharton's denial of Dube's Article 33 appeal is simply insufficient to impose either section 1983 or state law liability on Komisar. Cf. Musso, 836 F.2d at 743 (no legal liability for "failing to prevent" another from violating plaintiff's First Amendment rights). Accordingly, all claims against Komisar should be dismissed.
 
 
 68
 Finally, no reason has been advanced why, at this stage of the litigation, Dube should not be allowed to proceed with his pendent state law claims. Therefore, with the exception that the state law claims can provide no basis for injunctive relief against the remaining defendants, the district court properly denied defendants' motion for summary judgment on Dube's claims based on state law.
 
 CONCLUSION
 
 69
 In light of the foregoing, we (1) modify the partial grant and partial denial of defendants' motion for judgment on the pleadings and order (i) all claims against SUNY dismissed, and (ii) the preclusion of any injunctive relief based on Dube's state law (third and fourth) claims, and affirm as modified, (2) affirm the denial of defendants' motion for summary judgment on the issue of qualified immunity with respect to the First Amendment claim, (3) dismiss as moot defendants' motion for summary judgment on the issue of qualified immunity with respect to the Fourteenth Amendment claim, (4) modify the denial of defendants' motion for summary judgment on the merits and order (i) summary judgment to be entered in favor of Komisar as to all claims against him, and (ii) dismissal of Dube's Fourteenth Amendment claim.
 
 MINER, Circuit Judge, concurring:
 
 70
 I agree with each and every conclusion reached in Judge Meskill's comprehensive opinion and with the reasoning supporting those conclusions. I write only to note my disagreement with the basis asserted for appellate jurisdiction as regards the qualified immunity defense.
 
 
 71
 The opinion for the court recites that "without addressing the issue of qualified immunity in the context of either constitutional claim asserted, the district court nevertheless denied defendants' motion for summary judgment based on their defense of qualified immunity." Ante at 593. It seems to me, however, that the issue of qualified immunity as a defense to the constitutional claims asserted was clearly addressed in the opinion of the district court. After referring to Dr. Dube's "claim that he was denied tenure because of the controversy over the exercise of his constitutional right of free expression" and "his claim of the violation of his right to due process in that the same outside pressures interfered with his right to a fair hearing," the learned district judge concluded, following a discussion of how qualified immunity operates as defense to constitutional claims: "Summary judgment is therefore denied based on the qualified immunity defense."
 
 
 72
 In dealing with defendants' motion for summary judgment, the district court reviewed and ruled on the qualified immunity defense to the constitutional claims pleaded by plaintiff. Accordingly, our appellate jurisdiction as regards this defense should be predicated on Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (denial of the claim of qualified immunity subject to interlocutory review), rather than on Musso v. Hourigan, 836 F.2d 736, 741 (2d Cir.1988) (failure to rule on qualified immunity defense subject to interlocutory review).
 
 MAHONEY, Circuit Judge, generally concurring:
 
 73
 It is a little difficult to know how to label this separate opinion. Although I am in general agreement with Judge Meskill's thoughtful opinion for the court, it is precisely aspects of the "result" that cause me some difficulty. It would thus be especially inappropriate to say that I concur in the "result;" I therefore "generally" concur.
 
 
 74
 Specifically, our cases seem to call for dismissal of an appeal for lack of appellate jurisdiction, rather than affirmance of a denial of summary judgment, where a defendant invokes qualified immunity but is required to go to trial because there exist material issues of fact with respect to that defense, see, e.g., United States v. Yonkers Branch-NAACP, 893 F.2d 498, 502-04 (2d Cir.1990); Francis v. Coughlin, 891 F.2d 43, 44 n. 1 (2d Cir.1989), as we determine to be the case here with respect to the defense of qualified immunity to Dube's first amendment claim.
 
 
 75
 More fundamentally, the portion of Judge Meskill's opinion which addresses qualified immunity concludes, inexplicably in my view, that "the defendants are not qualifiedly immune from section 1983 liability on Dube's First Amendment claims," and that as a result of this ruling, "the defense of qualified immunity is removed from the case." Concededly, any defense of qualified immunity at trial would substantially, if not totally, overlap with defendants' case on the merits. All that has happened, however, is that defendants' motion for summary judgment, asserting the defense of qualified immunity to Dube's first amendment claim, has been denied, and we have ratified that denial. The denial of a motion for summary judgment leaves the question at issue in the case, and does not, without more, decide that question in favor of the movant's adversary.
 
 
 76
 With these qualifications, I join in Judge Meskill's opinion.
 
 
 
 [1]
 The claims of all plaintiffs except Dube have been dismissed with prejudice. These claims apparently related to the alleged First Amendment right of "Stony Brook's academic community, both students and professors, ... to benefit from Dr. Dube's participation in the intellectual life of the college community." No appeal has been taken from this dismissal
 
 
 [2]
 A similar proposed press release, dated August 31, 1983, was presented by Donald M. Blinken, chairman of the SUNY board of trustees, to a meeting of the board on that date; however, it is not clear whether this release was ever issued to the public
 
 
 [3]
 The complaint also sought a preliminary injunction requiring defendants to continue Dube's employment at Stony Brook during the pendency of the action. A motion for that relief was denied and no appeal has been taken from the denial
 
 
 [4]
 Since defendants base their appeal, both as to Eleventh Amendment immunity and to qualified immunity, on 28 U.S.C. Sec. 1291, Dube's contention that defendants failed to request any certification pursuant to 28 U.S.C. Sec. 1292(b) is not germane to the questions we must decide
 
 
 [5]
 It should be noted that, had the qualified immunity defense to Dube's constitutional claims been addressed and rejected by the district court, the author agrees with Judge Miner that appellate jurisdiction would be proper under Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985)
 
 
 [6]
 It is questionable whether Dube's First Amendment claim is well pleaded against individual defendants other than Wharton, since it is directed only to "Wharton's denial of tenure and of a continuing appointment." However, the parties have argued the issue to us in broader terms, and in view of the ease with which the complaint could be amended to correspond to the actual contentions of the parties, see Fed.R.Civ.P. 15(b), we have addressed these contentions in this opinion
 
 
 [7]
 Specifically, Article 33 of the Agreement provides that where, as here, a college president has decided against renewal of an appointment despite the recommendations of both academic review committees that have considered the matter, the aggrieved employee is entitled to a further review by the SUNY Chancellor. The Chancellor is required to utilize the advisory committee mechanism (the alleged manipulation of which by Wharton constitutes the basis of Dube's second federal claim for relief); however, regardless of the advisory committee's recommendation, "the Chancellor, pursuant to the Policies of the Board of Trustees, shall ... take such action as may, in the Chancellor's judgment, be appropriate." Moreover, Article 33 specifies that its provisions "shall not be deemed to create any manner of legal right, interest, or expectancy in any appointment to continuing appointment or permanent appointment."