Sylvia KAMINSKY, as Administratrix of the Estate of Herbert Kaminsky, Plaintiff,

v.

Saul ROSENBLUM, Raymond Broaddus, E. Michael Kalonick, Charles J. Scully, and John Doe, Defendants.

No. 88 Civ. 1840 (PKL).

United States District Court, S.D. New York.

May 21, 1990.

Debevoise & Plimpton, New York City (Edwin G. Schallert, Gail S. Johnson, Mary Ann Doyle, of counsel), for plaintiff.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City (Carol A. Cimkowski, Asst. Atty. Gen., of counsel), for defendants Saul Rosenblum, E. Michael Kalonick and Charles J. Scully.

## OPINION AND ORDER

LEISURE, District Judge.

This is an action brought pursuant to 42 U.S.C. § 1983 alleging that plaintiff's deceased husband was not provided adequate medical care while he was incarcerated at the Green Haven Correctional Facility. Plaintiff contends that her husband received such poor care that his Eighth Amendment rights were violated. Defendants Saul Rosenblum, E. Michael Kalonick, and Charles J. Scully have now moved for dismissal of the complaint or summary judgment pursuant to Fed.R.Civ.P. 12(b), 12(c), 12(h) and 56.[1]

## BACKGROUND

On April 15, 1985, Herbert Kaminsky ("Kaminsky") was sentenced to two consecutive two to four year terms of imprisonment after pleading guilty to nine felony counts including grand larceny. On April 30, 1985, he was assigned to the Downstate Correctional Facility. At the time of his incarceration, Kaminsky was 57 years old and suffered from numerous ailments including high blood pressure, diabetes, angina, gout and an enlarged spleen. Kaminsky was taking a number of medications at the time of his incarceration, and shortly after his arrival at Downstate he was seen by medical personnel who adjusted the medications he was receiving.

On July 22, 1985, Kaminsky was transferred to the Green Haven Correctional Facility located in Stormville, New York ("Green Haven"). Green Haven is a maximum security prison containing over 2000 inmates and operated by the New York State Department of Correctional Services ("DOCS"). During the period of Kaminsky's incarceration, defendant Charles J. Scully ("Scully") was superintendent of

Green Haven, defendant E. Michael Kalonick ("Kalonick") was the Regional Health Services Administrator for Green Haven, and defendant Saul Rosenblum ("Dr. Rosenblum") was Medical Director at Green Haven.

It is uncontested that during his approximately twelve months at Green Haven[2] Kaminsky received frequent medical attention. With the exception of a period in the summer of 1986, plaintiff does not contest that Kaminsky had regular contact with medical personnel both at Green Haven, and at the Westchester County Medical Center ("WCMC"). Plaintiff contends that the quality of care, particularly during the last months of Kaminsky's life, was so inadequate as to evidence deliberate indifference to Kaminsky's health and medical needs. A review of Kaminsky's medical treatment is necessary to understand the parties' positions in this motion.[3]

Shortly after his transfer to Green Haven, Kaminsky was seen by Dr. Balvir Tambar ("Dr. Tambar"), one of the physicians at Green Haven. Blood tests were performed shortly thereafter, indicating ongoing problems, apparently consistent with Kaminsky's previously diagnosed heart disease and diabetes. Based on these tests and a review of Kaminsky's medical history, Dr. Tambar recommended that Kaminsky be placed on a restricted diet and not be required to undertake any physical exertion. In late August 1985, Kaminsky went to the hematology clinic at WCMC. After apparently performing some tests, the attending physician at the hematology clinic indicated a desire to review Kaminsky's prior medical records, and also requested that Kaminsky be returned to the clinic in two weeks. On August 30, 1985, Kaminsky returned to WCMC for a visit to the

1. Plaintiff discontinued her action against defendant Raymond Broaddus by a stipulation approved by the Court and filed on October 2, 1989.

2. Kaminsky was incarcerated at Green Haven from July 1985 until his death in August 1986. For approximately one month during this period, late October 1985 to early December 1985, Kaminsky was incarcerated in Bergen County, New Jersey, awaiting disposition of a New Jer-

sey felony indictment. At least one blood test was performed on Kaminsky while he was in New Jersey custody.

3. The Court has not attempted to indicate every one of Kaminsky's clinic visits or medical treatments, only those that have some significance to his overall medical care. Where there was a gap in his treatment, it has been noted.

cardiology clinic. The cardiologist noted that, after walking only ten to fifteen steps, Kaminsky developed chest pain and had trouble breathing. The doctor suggested an adjustment in Kaminsky's medications, including the addition of daily doses of orange juice. The doctor further suggested severe restrictions on Kaminsky's physical activity. Dr. Tambar reviewed the cardiologist's recommendations some ten days later, implemented the medicinal changes, recommended that Kaminsky be housed on the first floor of the cell block to avoid the use of stairs, but denied the request for daily supplements of orange juice.

Kaminsky visited the cardiology clinic at WCMC again on September 30, 1985, at which time he complained of continued chest pain and shortness of breath. The cardiologist suggested a further adjustment in his medication, and again recommended orange juice, apparently to increase Kaminsky's potassium level. Dr. Tambar again reviewed the findings from WCMC, and implemented all the suggested changes except the orange juice supplement. Kaminsky visited the cardiology clinic again on October 21, 1985. Again, medicinal modifications were recommended, as was the addition of orange juice or banana supplements. Dr. Tambar followed all the recommended adjustments, but, noting that Kaminsky's potassium level was normal, did not add orange juice or bananas to Kaminsky's diet.

On October 25, 1985, Dr. Rosenblum saw Kaminsky at the Green Haven clinic. This was apparently the first time Dr. Rosenblum had seen Kaminsky as a patient. After the examination, Dr. Rosenblum requested that Kaminsky be housed on the first floor of the cell block, indicating that he had not previously been so housed despite the earlier request from Dr. Tambar. On October 29, 1985, Kaminsky was transferred to the custody of New Jersey prison officials for disposition of charges then pending in Bergen County. Kaminsky was returned to Green Haven on December 11, 1985. On December 30, 1985, Kaminsky returned to the cardiology clinic at WCMC for a follow-up visit. The cardiologist, af-

ter examination, recommended further hematolytic and cardiatric testing.

On January 23, 1986, Kaminsky was sent to the hematology clinic at WCMC. This was his first visit to the hematology clinic since August 21, 1985, despite the request of the hematologist at that time that Kaminsky be returned for a follow-up visit within two weeks. At the January 23 examination, the attending physician noted Kaminsky's weight at 244 pounds, and performed a series of blood tests. One of those tests indicated that Kaminsky tested positive for hepatitis B. It is not clear whether Kaminsky was ever informed that he was suffering from hepatitis B, a communicable and often chronic disease. On January 31, 1986, Kaminsky again returned to the cardiology clinic, at which time the cardiologist apparently recommended that Kaminsky undergo a coronary angiogram if his hematology was sufficiently stable to permit surgery.

On February 5, 1986, Kaminsky was scheduled to return to the hematology clinic. He refused to meet that appointment, indicating that he was expecting a visitor that day. On February 28, 1986, Dr. Felix Wroblewski ("Dr. Wroblewski"), Kaminsky's doctor prior to his incarceration, visited Kaminsky at Green Haven. There is no evidence of the purpose of Dr. Wroblewski's visit; it is clear, however, that Dr. Wroblewski did not examine Kaminsky, nor did he attempt to see Dr. Rosenblum or any other officials at Green Haven. Kaminsky returned to the cardiology clinic at WCMC, on March 3, 1986, and again on March 17, 1986. Adjustments in his medication were again ordered in response to his continuing complaints of pain and shortness of breath.

On March 25, 1986, Kaminsky returned to WCMC, this time as an in-patient. He remained at the hospital until April 7, 1986. During his hospitalization, Kaminsky underwent numerous tests, including cardiologic tests, a bone marrow study, and a liver biopsy. During April 1986, Kaminsky made a series of visits to the clinic at Green Haven. On May 2, 1986, Kaminsky returned to the cardiology clinic at WCMC, where it was noted that Kaminsky's heart

condition seemed under control, though the physician noted marked high blood pressure. Kaminsky apparently could not tolerate the blood pressure medicine prescribed by the cardiologist and ceased to take it after only a few days.

On May 14, 1986, Kaminsky visited the hematology clinic. Along with the regular consultation report, the clinic included the results of Kaminsky' liver biopsy, performed while he was an inpatient. The biopsy indicated that Kaminsky had chronic hepatitis and cirrhosis of the liver, which was consistent with alcoholic hepatitis. It is again unclear whether Kaminsky was informed of the hepatitis diagnosis; Kaminsky was informed, however, of the diagnosis of cirrhosis of the liver. This diagnosis disturbed him, and, on May 15, 1986, he wrote to Dr. Wroblewski indicating his concern and also indicating that he might wish to be treated by specialists other than those available to him at Green Haven and WCMC.

Kaminsky returned to WCMC on June 5, 1986, at which time the physician noted that Kaminsky's condition seemed stable. The doctor also noted that Kaminsky had received blood transfusions on at least three occasions, the last in 1983. The doctor indicated that further evaluation was necessary, requesting that Kaminsky be returned to the hospital with the results of his previous tests. On June 9, 1986, Kaminsky was scheduled to visit the cardiology clinic. He refused to go, indicating that he was expecting a visitor that day.[4]

On June 5, 1986, Dr. Wroblewski wrote to Scully, with copies to Dr. Rosenblum and Kalonick, indicating his concern regarding the diagnosis of cirrhosis of the liver, and indicating his willingness to provide consultation services if such was desired or possible. On June 24, Dr. Rosenblum responded

to Dr. Wroblewski's letter, indicating the precise results of the biopsies, and that he would try to have the biopsy slides forward to Dr. Wroblewski. Dr. Wroblewski responded on June 30 that he would be back in touch with Dr. Rosenblum, after he had had a chance to review the biopsy slides.

From June 13 to August 6, 1986, Kaminsky was not seen by a doctor either at Green Haven or at WCMC. Twice during that period he saw a nurse at Green Haven who checked his blood pressure and renewed his medications. When Dr. Rosenblum saw Kaminsky on August 6, he noted that Kaminsky's weight had dropped to 200 pounds, that his spleen was enlarged, his lungs clear, and his blood pressure seriously elevated. Dr. Rosenblum also apparently indicated to Kaminsky that he was trying to send Kaminsky to New York City to see Dr. Wroblewski.

On August 21, 1986, Kaminsky, in the company of two corrections officers, was transported to Dr. Wroblewski's office in New York City. Prior to this visit, Dr. Wroblewski had received independent lab reports on Kaminsky's biopsies which confirmed the diagnosis of cirrhosis of the liver. Dr. Wroblewski undertook a thorough examination of Kaminsky, indicating in his office record that Kaminsky complained of a poor appetite, diarrhea, trouble sleeping, and serious pain. He performed blood tests, and recommended that Kaminsky be admitted to a hospital for a "work up." The parties disagree as to the import that Dr. Wroblewski placed on this suggested hospitalization, and whether Dr. Wroblewski indicated that the hospitalization needed to take place immediately or could be delayed. Dr. Wroblewski spoke to Dr. Rosenblum after the examination and suggested hospitalization. Dr. Rosenblum

---

4. This was one of a number of times during the course of his incarceration when Kaminsky refused to attend a scheduled medical appointment, either at WCMC or at Green Haven. Often his reason for refusing to attend was that he was scheduled to have a visitor that day, an important event for any prisoner. It should also be noted that on at least one occasion Kaminsky was shipped to WCMC, only to learn that his appointment there had been cancelled by the hospital. Additionally, it is clear that Kaminsky was frequently the victim of the sort of delays and inattention which are all too well known to anyone who has sought non-emergency care at a major hospital. His frustration was evident on the refusal form he filled out on June 9, 1986. Kaminsky wrote, "every time I go I sit there and they tell me I got your paper." Plaintiff's Exhibits, Vol. 1 at 54.

and Dr. Wroblewski now disagree as to whether Wroblewski told Dr. Rosenblum that Kaminsky should be hospitalized immediately, and whether Dr. Wroblewski indicated that Kaminsky's physical condition was dire.

In either case, Kaminsky was not sent to a hospital until August 26, 1986, a day after Dr. Rosenblum noted that Kaminsky's weight had dropped to 186 pounds, and that he was having serious difficulty breathing. Upon his admission to Horton Memorial Hospital ("Horton"), Kaminsky underwent a series of tests, and was assigned to the coronary care unit. A chest x-ray revealed infiltrates in both lungs. During his hospitalization, Kaminsky's pulmonary and respiratory condition continued to deteriorate. On August 28, in an effort to determine the cause of Kaminsky's severe lung congestion, the doctors at Horton performed a lung biopsy. Kaminsky died shortly after completion of that biopsy.

An autopsy indicated that Kaminsky was suffering from numerous ailments at the time of his death. In addition to the previously diagnosed liver cirrhosis, coronary illness, diabetes, and an enlarged spleen, Kaminsky tested positive for the AIDS virus, and at the time of his death was suffering from pneumocystis carinii pneumonia, an aggressive opportunistic infection associated with AIDS. *See* Defendants' Exhibit N.

Plaintiff alleges that the quality of care given to Kaminsky during his incarceration, particularly during the last months of his life, make out a pattern of deliberate indifference to Kaminsky's medical needs. In particular, plaintiff contends that defendants failed to follow up on recommendations made by WCMC, ignored many of Kaminsky's more complex medical complaints, failed to inform him of his positive hepatitis test, failed to provide any significant care during Kaminsky's final months despite his visibly deteriorating conditions and numerous requests from Kaminsky and his family, and failed to hospitalize Kaminsky in time to prevent his demise. Defendants assert that, at most, plaintiff has made out a claim for medical malprac-

tice, not deliberate indifference, and that, in reality, all plaintiff's allegations really show is a disagreement among medical professionals about how to treat Kaminsky.

## DISCUSSION

Defendants have moved for dismissal of plaintiff's claims on the pleadings or, in the alternative, for summary judgment. A motion for dismissal pursuant to Fed.R. Civ.P. 12(b) or 12(c) must be decided on the pleadings before the Court, including any materials implicitly or explicitly incorporated by reference into the pleadings. *See Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985). In deciding a motion to dismiss, the Court may not look to materials outside of the scope of the pleadings. Where the Court is confronted with matters outside of the pleadings that it wishes to consider, it should treat the motion to dismiss as one for summary judgment pursuant to Fed.R.Civ.P. 56. *See Krijn v. Pogue Simone Real Estate Co.*, 896 F.2d 687, 689 (2d Cir.1990); *National Association of Pharmaceutical Mfrs., Inc. v. Ayerst Laboratories*, 850 F.2d 904, 911 (2d Cir.1988).

Fed.R.Civ.P. 12(c) requires that when a court converts a motion to dismiss to a motion for summary judgment, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Rule 12(c). *See Ayerst, supra; Villante v. Department of Corrections*, 786 F.2d 516, 521 (2d Cir. 1986). In the instant case, plaintiff was on notice that the Court might choose to consider the instant motion as one for summary judgment, as defendants presented their papers in the alternative as a motion to dismiss or for summary judgment. Further, plaintiff's responsive papers make it clear that the she contemplated consideration of the instant material under the summary judgment standard. *See* Plaintiff's Memorandum of Law at 45–46.

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." " 'Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.' " *Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 10 (2d Cir.1989), *quoting Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

█ The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will probably preclude the entry of summary judgment.... While the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510; *see also R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 107 (2d Cir.), *cert. denied sub nom. Thomas J. Lipton, Inc. v. R.C. Bigelow, Inc.,* — U.S. ——, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials it believes "demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Trebor Sportswear Co. v. Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of

evidence to support the nonmoving party's case." *Celotex, supra,* 477 U.S. at 325, 106 S.Ct. at 2554.

Indeed, once a motion for summary judgment is properly made, the burden then shifts to the nonmoving party, which "must set forth facts showing that there is a genuine issue for trial." *Anderson, supra,* 477 U.S. at 250, 106 S.Ct. at 2511. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (citations omitted).

*A) Eighth Amendment Claim*

"It is fundamental ... that § 1983 creates no independent, substantive constitutional rights but rather is a vehicle for enforcing such rights." *Rosa R. v. Connelly,* 889 F.2d 435, 440 (2d Cir.1989); *see also Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617–18, 99 S.Ct. 1905, 1915–16, 60 L.Ed.2d 508 (1979). In the instant case, plaintiff alleges that defendants breached Kaminsky's Eighth Amendment rights to be free from cruel and unusual punishment[5] by failing to provide him with proper medical care. The Supreme Court addressed the Eighth Amendment requirements for the provision of medical care to prisoners in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *reh'g denied,* 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977). Though the Court in *Estelle* did not find that the care given to the plaintiff by the prison medical director violated the plaintiff's constitutional rights, the Court did explain the standard for determining whether medical care as provided was insufficient as a matter of law. The Court noted that the Eighth Amendment

proscribes more than physically barbarous punishments. The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ...," against which we must

---

**5.** The Eighth Amendment states, "Excessive bail shall not be required, nor excessive fines im-

posed, nor cruel and unusual punishments inflicted."

evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain."

These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," ... In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency ...

429 U.S. at 102–03, 97 S.Ct. at 290 (citations omitted). The Court concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291, *quoting Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976). However, the Court was careful to note that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* 429 U.S. at 106, 97 S.Ct. at 292.

Courts in this Circuit have, sadly, been faced with a number of cases since *Estelle* where the medical care provided to prisoners at certain correctional facilities has been so wanting as to require judicial intervention. In *Todaro v. Ward*, 565 F.2d 48 (2d Cir.1977), the Court found the administration of medical services at the Bedford Hills Correctional Facility for women to be woefully inadequate. The Court noted that "essential medical services were denied, or unreasonably delayed and inmates forced to suffer needless pain." 565 F.2d at 50. In reaching its decision that the conditions at Bedford Hills violated the constitutional rights of the inmates, the Court stated

that, "while a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to agonies engendered by haphazard and ill-conceived procedures." 565 F.2d at 52.

The *Todaro* decision has not been limited to situations where groups of inmates or a whole inmate population has been denied medical care. In *Johnson v. Harris*, 479 F.Supp. 333 (S.D.N.Y.1979), Judge Edward Weinfeld of this Court found that a pattern of continued failure to provide a severely diabetic inmate with a medically appropriate diet, resulting in a serious decline in the inmate's health, was a clear violation of the *Estelle* standard.

In *Archer v. Dutcher*, 733 F.2d 14 (2d Cir.1984), the Second Circuit reversed the district court's grant of summary judgment for the defendants where the pregnant plaintiff alleged that she had told the defendant medical personnel that she was in pain and that she was concerned about the condition of her fetus, and yet was not sent to a hospital until twelve days after initial complaints. The Court, while expressing doubt about the ultimate success of the plaintiff's claims, found that the plaintiff's assertions of delay in providing emergency medical treatment were sufficient to defeat summary judgment. "[I]f defendants did decide to delay emergency medical aid— even for 'only' five hours—in order to make [the plaintiff] suffer, surely a claim would be stated under *Estelle*." 733 F.2d at 16.

In *Hathaway v. Coughlin*, 841 F.2d 48 (2d Cir.1988), the Court, relying on *Archer*, again reversed a grant of summary judgment in favor of prison officials. The plaintiff in *Hathaway* alleged that he suffered severe pain over two years while prison officials delayed arranging surgery to repair broken surgical pins in the plaintiff's hip. The Court found that this substantial delay alone raised a sufficient question of fact as to whether the officials' conduct constituted deliberate indifference to the plaintiff's medical needs.

Most recently, the Second Circuit indicated that, in examining a claim of deliberate indifference to medical need, the district court must look to the needs of the individual patient, not to the standard of care for an average plaintiff. *Liscio v. Warren*, 901 F.2d 274 (2d Cir.1990). In *Liscio*, the plaintiff alleged that the physician on duty at the New Haven Correctional Center infirmary misdiagnosed his alcohol withdrawal symptoms and failed to monitor adequately the plaintiff's condition during the course of his withdrawal from alcohol, which resulted in severe pain, rapid deterioration in the plaintiff's physical condition, and, ultimately, renal failure and severe dehydration. The Court found that, although the alleged failure of medical care occurred over only three days, the plaintiff deteriorated so rapidly, and his condition was so serious, that even the three days lapse could be considered deliberate indifference.

In reviewing the Second Circuit cases involving claims of deliberate indifference to an inmate's medical needs, the Court has noted the Circuit Court's unwillingness to permit a grant of summary judgment where there is any evidence that might lead a finder of fact to hold that treatment or lack thereof constituted deliberate indifference. Indeed, the Court has provided instruction to the district courts that determining the difference between malpractice and deliberate indifference is a factual issue which cannot properly be decided at the summary judgment stage. *Archer, supra,* 733 F.2d at 17; *see also Liscio, supra,* 901 F.2d at 276–77; *Hathaway, supra,* 841 F.2d at 50.

 In the instant case, the Court finds that there are genuine issues of material fact relating to the care given to Kaminsky

while he was incarcerated. Among the genuine issues of fact remaining unresolved by the current record, the Court is particularly concerned by Dr. Wroblewski's deposition in which he alleges that after Kaminsky visited his office on August 21, 1986, he recommended immediate hospitalization for Kaminsky, which was not accomplished by defendants. *See* Plaintiff's Exhibits, Vol. 3 at 606. While there is evidence which could be viewed as contradicting Dr. Wroblewski's recollection, the Court cannot reject his deposition testimony at this time. Further, the Court finds that there is an unexplained gap in Kaminsky's medical care from June 1986 to August 1986. During that period, Kaminsky saw a nurse twice, but was not seen by a doctor either at Green Haven or at WCMC. There is evidence on the record that Kaminsky's condition deteriorated seriously during this period, both from the testimony of his family, *see* Plaintiff's Exhibits, Vol. 3 at 509–17, 557–62, 622, from letters written by Kaminsky himself to his lawyers and to Dr. Rosenblum, Plaintiff's Exhibits, Vol. 1 at 164–72, and from affidavits before the Court, *see, e.g.,* Affidavit of Peter Grassia, sworn to on January 26, 1990; Affidavit of Cornelius Dugan, sworn to on December 27, 1989. Finally, the Court finds that there is a genuine issue as to whether Dr. Rosenblum's alleged statements to plaintiff and his letters to Kaminsky's lawyers indicate a tendency toward deliberate indifference. *See generally* Plaintiff's Exhibits, Vol. 1 at 136–50.[6]

## B) Personal Involvement

 Defendants argue that, regardless of whether there are material issues of fact regarding the quality of care given to Kaminsky, defendants Kalonick and Scully

---

**6.** The Court does agree with defendants that plaintiff's attempt to inject the *Milburn* consent decree into this case as evidence of substantive violations of Kaminsky's rights is inappropriate. In 1982, a consent decree was entered into by DOCS in *Milburn v. Coughlin,* 79 Civ. 5077 (RJW) (S.D.N.Y.). In that decree, DOCS agreed to improve the provision of medical services at Green Haven. Specific conditions for provision of certain services were required under the decree, some of which plaintiff alleges were violat-

ed by defendants during Kaminsky's incarceration. That issue is not, and cannot be, before this Court. Violations of the *Milburn* decree can be remedied only by bringing the alleged violations to the attention of the able District Judge who retains supervision over that decree. The Court, however, does find that the *Milburn* decree is appropriately presented as evidence of defendants' knowledge of the legal standards controlling this action. *See* discussion *infra.*

cannot be held liable under § 1983 because they were not personally involved in Kaminsky's medical care. The personal involvement of a defendant in the plaintiff's alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir.1987); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Eng v. Coughlin*, 684 F.Supp. 56, 65 (S.D.N.Y.1988).

 "A defendant may be personally involved in a constitutional deprivation within the meaning of [§ 1983] in several ways. The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if she was grossly negligent in managing subordinates who caused the unlawful condition or event." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986) (citations omitted). A supervisory official may be charged with knowledge of constitutionally violative acts "when they know of specific risks or hazards to a prisoner and fail to take action to protect him." *Villante supra*, 786 F.2d at 519 (citation omitted).

There is evidence in the record before the Court that defendants Scully and Kalonick were made aware of Kaminsky's condition and his unhappiness with the care he was receiving at Green Haven. Viewing the evidence in the light most favorable to plaintiff, as the Court must on a summary judgment motion, the Court finds that there is a genuine issue of material fact as to whether Scully and Kalonick lacked personal knowledge of Kaminsky's allegedly deficient treatment and failed to take any

significant steps to improve conditions. *See Eng, supra*, 684 F.Supp. at 67. Thus, the Court must deny defendants Scully's and Kalonick's motion for summary judgment for lack of personal involvement.[7]

### C) Qualified Immunity

 Qualified or good faith immunity is an affirmative defense to a § 1983 action. *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). The shield of immunity will not protect the defendant if that defendant "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Id.* "Prison officials may be protected from personal liability under § 1983 when their 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Fox v. Coughlin*, 893 F.2d 475, 477 (2d Cir.1990) (per curiam), *quoting Harlow, supra*, 457 U.S. at 818, 102 S.Ct. at 2738). *See also Molinelli v. Tucker,* 901 F.2d 13, 15 (2d Cir.1990).

 Thus, in the instant case, in order to obtain the protection of qualified immunity, defendants must show that, at the time of Kaminsky's incarceration, it was not legally clear that the conduct alleged by Kaminsky implicated Kaminsky's constitutional rights. *Molinelli, supra*, at 15; *see also Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989). "The very action in question need not previously have been held unlawful, but the unlawfulness must be apparent in light of preexisting law." *Neu v. Corcoran*, 869 F.2d 662, 665 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989). The determination of whether it was legally clear to the official that the actions alleged were violative

---

**7.** Defendants argued in their Memorandum of Law that plaintiff is suing Scully and Kalonick on the grounds of *respondeat superior. See* Defendants' Memorandum of Law at 13. While defendants are correct that *respondeat superior* alone is not a sufficient ground for finding a

supervisory official liable under § 1983, *see, e.g., Villante, supra*, 786 F.2d at 519, that was not the ground on which plaintiff sued Scully and Kalonick. Plaintiff alleges that all defendants were personally involved in the deprivation of plaintiff's constitutional rights.

of the plaintiff's constitutional rights is to be based on objective reasonableness, *Robison v. Via*, 821 F.2d 913, 920–21 (2d Cir. 1987), not on the subjective knowledge of the defendant official or officials.

 The law is clear that deprivation of medical care such that it causes unnecessary pain and suffering, constitutes a constitutional violation of an inmate's rights. *See Estelle, supra; Todaro, supra;* discussion, *supra.* Officials at Green Haven were particularly aware of the legal requirements. Only three years before Kaminsky's incarceration, DOCS agreed to a consent order in *Milburn v. Coughlin*, 79 Civ. 5077 (RJW) (S.D.N.Y.) which regulated the provision of health care services at Green Haven. That consent decree, which defendants do not deny knowledge of, set forth specific standards and procedures for the medical services at the facility. Thus, there is no question here that, objectively, the state of the law was clear to defendants at the time of Kaminsky's incarceration. As the Court has noted above, there are sufficient genuine issues of fact as to each defendant's involvement in Kaminsky's care, and as to the quality of that care, to prohibit the entry of summary judgment on the current record. Determination of this issue must await fact-finding, something the Court cannot do on a motion for summary judgment. "It may be that [ ] aspects of the alleged conduct will be shown to violate constitutional standards, yet not fall below standards sufficiently delineated to make a reasonable official aware of the unlawfulness." *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir.1989). That determination cannot properly be made on the instant motion. *See Id.*

### D) Eleventh Amendment

 Defendants further assert that plaintiff's claims are barred by the Eleventh Amendment.[8] " 'The Supreme Court

has consistently held that the federal courts lack jurisdiction not only over suits against a state brought by citizens of other states, as the literal language of the Amendment provides, but also over suits against such states brought by their own citizens. Thus, it is clear that, with few exceptions, federal courts are barred from entertaining suits brought by a private party against a state in its own name.' " *Dube v. State University of New York*, 900 F.2d 587, 594 (2d Cir.1990), *quoting Dwyer v. Regan*, 777 F.2d 825, 835 (2d Cir.1985), *modified*, 793 F.2d 457 (2d Cir.1986). Thus, unless a state has explicitly consented to the litigation, *see Papasan v. Allain*, 478 U.S. 265, 276–77, 106 S.Ct. 2932, 2939–40, 92 L.Ed.2d 209 (1986), or Congress has enacted legislation specifically overriding the state's immunity, *see Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), the suit will not survive Eleventh Amendment scrutiny.[9] Further, "[a]ctions against state officials are also barred by the Amendment where the relief granted would bind the state or where the state is the real party in interest." *Russell v. Dunston*, 896 F.2d 664, 667 (2d Cir.1990); *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir.1988).

Defendants claim that they have been named as sham parties, with the State as the real party in interest, or have been named in their official capacities. In either situation, defendants assert, plaintiff's action is barred by the Eleventh Amendment. Plaintiff contends that she has sued defendants in their individual, not their official capacities. Thus, "[i]n assessing whether the Eleventh Amendment bars recovery in this action, this court must determine whether [plaintiff] sued the defendants in their personal or official capacities. Per-

---

8. The Eleventh Amendment states,
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

9. It is well settled that § 1983 does not constitute an exercise of Congress' authority to override a state's Eleventh Amendment immunity. *Quern v. Jordan*, 440 U.S. 332, 340–42, 99 S.Ct. 1139, 1144–46, 59 L.Ed.2d 358 (1979); *Dube, supra*, 900 F.2d at 594.

sonal or individual capacity suits seek to impose personal liability upon a government official for actions he or she took under color of state law. Official capacity suits, on the other hand, are, in all respects other than name, suits against a government entity." *Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir.1988) (citations omitted). In an official capacity action, the government entity's policy or custom must have played a part in the constitutional violation. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985).

Plaintiff's allegations, when viewed in the light most favorable to her, make out an individual capacity action, not an official capacity action. She alleges that defendants, "acting under color of State law, did ... fail to satisfy the medical needs of Kaminsky, ... in violation of the Eighth and Fourteenth Amendments of the United States Constitution." Complaint ¶ 29. There is no allegation that defendants acted in furtherance of a State policy which resulted in Kaminsky's allegedly deficient care. Indeed, in her moving papers, plaintiff contends that defendants acted contrary to the strictures of the *Milburn* consent decree, the contents of which are the policy of DOCS and the State of New York.[10] Plaintiff clearly asserts that Dr. Rosenblum, through his own action, failed to meet Kaminsky's medical needs, and that defendants Kalonick and Scully were on notice of this deficient care and failed to take action. Thus, the suit alleges improper actions by defendants personally, not in any official or representative capacity. Accordingly, defendants do not enjoy the protection of the Eleventh Amendment.

### CONCLUSION

Defendants' motion for summary judgment is denied in its entirety.

Plaintiff's counsel is directed to contact the Court within twenty (20) days of this order to set a date convenient to the parties and the Court for a pre-trial conference in this matter.

SO ORDERED.

---

**10.** Plaintiff also correctly points out that, in an official capacity suit, plaintiff must substitute parties when the defendant named leaves the position from which he is sued. Both Dr. Rosenblum and Kalonick have left the positions they held during Kaminsky's incarceration, yet plaintiff has not substituted the current officials holding those positions. This procedural nicety, while important, is not significant evidence in determining whether the officials involved are sued in their personal, as opposed to their official capacities.