Edward VEGA, Plaintiff–Appellee,

v.

Floyd H. MILLER, James C. DeSimone, Howard L. English, Carolyn D. Jones, and G. Peter Cooney, Defendants–Appellants.

Docket No. 00–9214.

United States Court of Appeals, Second Circuit.

Argued: May 3, 2001.

Decided: Nov. 29, 2001.

Robert H. Easton, Asst. Solicitor Gen., New York, N.Y. (Eliot Spitzer, N.Y. State Att'y Gen., Michael S. Belohlavek, Dep. Solicitor Gen., Marion R. Buchbinder, Asst. Solicitor Gen., New York, N.Y., on the brief), for defendants-appellants.

Laura A. Menninger, Paul, Weiss, Rifkind, Wharton & Garrison, New York, N.Y., on the brief, for plaintiff-appellee.

Before: NEWMAN and CABRANES, Circuit Judges; and UNDERHILL,[*] District Judge.

Judge JOSÉ A. CABRANES dissents in a separate opinion.

JON O. NEWMAN, Circuit Judge.

This appeal concerns the availability of a qualified immunity defense for five administrators at the New York Maritime College ("College") who discharged a non-tenured teacher for leading a classroom "word association" exercise. The administrators concluded that the teacher had acted unprofessionally when he failed to terminate the exercise in which students, some standing on chairs, shouted out vulgar, sexually explicit terms, many of which the teacher wrote down, in words or initials, on a blackboard. The administrators appeal from the September 11, 2000, order of the District Court for the Southern District of New York (Denise L. Cote, District Judge) denying their motion for summary judgment on the ground of qualified immunity. Without deciding whether the discharge of the Plaintiff, Professor Edward Vega, might have entitled him to any relief from the College that would not encounter Eleventh Amendment obstacles,[1] we conclude that qualified immunity shields the administrators from any obligation to pay Vega any money damages. We therefore reverse and remand with directions to dismiss.

## Background

The College is a state-run co-educational institution that aims to prepare its students—or as the College calls them, "cadets"—for service as engineers or officers in various branches of the armed services. It requires its students to demonstrate "[r]espect for others" and "regimental discipline at all times." Plaintiff–Appellee Edward Vega began teaching at the College in August 1993. He was a non-tenure-track professor, and could be terminated at will.

In the summer of 1994, Vega taught a six-week composition course at the College's Summer Institute, a program designed for pre-freshmen who need remedial courses prior to matriculation. The students were male and female, aged 17 and 18. On July 21, Vega conducted a free-association exercise called "cluster-

---

[*] Honorable Stefan R. Underhill of the United States District Court for the District of Connecticut, sitting by designation.

1. Vega acknowledges that after his termination from the Maritime College, he was offered employment at Palm Beach Community College.

ing," in which students were invited to select a topic, then call out words related to the topic, and finally group related words together into "clusters." According to Vega, the exercise is intended to help students reduce the use of repetitive words in college-level essays.

The students selected "sex" as the topic for the "clustering" exercise. Vega understood the topic to be "sex and relationships." Vega then invited the students to call out words or phrases related to the topic, and he wrote at least many of their responses on the blackboard. The first words called out were, as Vega described them, "very safe words," such as "marriage," "children," and "wedding ring." As the exercise continued, the words called out included "penis," "vagina," "fellatio," and "cunnilingus." Toward the end of the exercise, with all but one of the students yelling and two standing on chairs, the following words and phrases were called out: "cluster fuck," "slamhole," "bearded clam," "fist fucking," "studded rubbers," "your [sic] so hard," and "eating girls out." [2]

Vega wrote many of the words on the blackboard, but said that he used initials for "some of the words that [Admiral] Floyd Miller [President of Maritime College] found to be disgusting examples of sexual harassment," and "some I didn't even abbreviate." At no point in the session did Vega seek to curtail the vulgarity of what the students were yelling, or terminate the exercise. He contends that after the exercise he "cautioned [the] stu-

dents that such terms would alienate their readers and should not be used at all or used rarely and then only where it was essential to enlighten and persuade the reader." Complaint ¶ 17.

None of the students or their parents ever complained about the exercise. It came to the attention of the College administrators in the course of investigating a complaint by a student on another matter.

When the College administrators became aware of the clustering exercise, Admiral Miller asked Dr. Howard L. English, Vice–President of Academic Affairs, to meet with Vega. English and Dean of Admissions G. Peter Cooney confronted Vega on August 17. Vega handed English copies of his lesson plans, which included many provocative topics.[3] English explained that he and Miller found the clustering exercise inappropriate, and that it opened the door to bad publicity and possible sexual harassment complaints. English told Vega that they would not offer him reappointment for the upcoming school year.

English officially terminated Vega's contract by correspondence dated August 18, 1994. English drafted a memorandum to the file that explained Vega's firing, attributing it to Vega's "reliance on sex as a theme" and "use of sexually explicit vocabulary" in the clustering exercise. English claims that he also wrote a very brief memo (without an explanation for the firing) for Vega's personnel file.[4]

---

**2.** The words and phrases were written down by a resident advisor assigned to attend Vega's class and tutor students, and his notes are in the record.

**3.** For example, a list of final essay topics included "Women who get raped usually deserve it" and "Mentally retarded people should be gassed."

**4.** English claims that the memo to the file was placed only in the vice-president's personal file (which would be accessible only to English and successor vice-presidents), because he did not want it to impair Vega's prospects for future employment. However, Vega testified that the Defendants' attorney said otherwise in the state court proceedings, maintaining that she found the memo in

Miller met with Vega on August 24 to review the decision. Miller called Vega's conduct "vile," "vulgar," "pornographic," and "irresponsible," and told Vega that it could be considered sexual harassment, and could create liability for the college. Miller ratified English's termination of Vega. Both English and Miller acknowledge that the sole reason they decided to fire Vega was because of his conduct in the July 21, 1994, clustering exercise.

On August 3, 1997, Vega filed a suit in the District Court, alleging numerous causes of action against several administrators and various school entities. Over the next several months, Judge Cote dismissed the complaint in its entirety against many of the Defendants, and dismissed some of the claims against the remaining Defendants. However, she denied motions to dismiss three of the claims against five of the Defendants, Appellants on this appeal. They are Admiral Miller, Vice–President English, Dean Cooney, James C. DeSimone, Commandant of Cadets, and Carolyn D. Jones, Director of the Summer Institute.

The remaining claims are all brought under 42 U.S.C. § 1983. They allege that the decision not to reappoint Vega (1) violated his First Amendment right to academic freedom (the "academic freedom claim"), (2) was made pursuant to an unconstitutionally vague or overbroad sexual harassment policy (the "sexual harassment policy claim"), and (3) infringed his Fourteenth Amendment due process right to a hearing prior to governmental adverse employment action that sullies his good name and reputation (the "stigma-plus claim").

The Defendants first filed a motion to dismiss on November 10, 1997, arguing, among other things, that they were entitled to qualified immunity on the ground

that the law concerning Vega's claims was not clearly established in 1994. Judge Cote denied this motion, ruling that the law as to both the academic freedom claim and the stigma-plus claim was clearly established in 1994, and that the question of whether the Defendants' sexual harassment policy was unconstitutionally vague or overbroad was a "fact intensive one that cannot be resolved on a motion to dismiss." *Vega v. State University of New York Board of Trustees,* 67 F.Supp.2d 324, 342 (S.D.N.Y.1999). The Defendants did not appeal this decision.

After the close of discovery, the Defendants moved for summary judgment, arguing that there was insufficient evidence to support the Plaintiff's claims and that they were protected against claims for money damages by qualified immunity. On Sept. 7, 2000, Judge Cote denied the summary judgment motion from the bench. On the "academic freedom" claim, she ruled that an issue of fact remained as to the relationship between "clustering" and Vega's educational objective and as to the "context and manner" of the classroom exercise. On the "sexual harassment policy" claim, she ruled that there was a factual issue as to whether Vega was terminated pursuant to the policy, that she could not rule as a matter of law that the policy was not unconstitutionally vague or overbroad, and that qualified immunity was not available on this claim because cases such as *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and *Dube v. State University of New York,* 900 F.2d 587 (2d Cir.1990), "clearly establish Vega's right to be free from enforcement of a [College] policy that constitutes on its face or as applied a vague or overbroad restriction on classroom speech." She distinguished a Ninth Circuit case that had afforded qualified immunity to defen-

Vega's personnel file, an allegation we accept for purposes of this appeal.

dants in similar circumstances, *Cohen v. San Bernardino Valley College*, 92 F.3d 968 (9th Cir.1996), because the policy in that case was "different and narrower" than the one at issue here. Judge Cote also found fact questions as to Vega's stigma-plus claim: whether stigmatizing statements were made "in the course of Vega's termination" and whether the statements were publicized.

## Discussion

### I. Appellate Jurisdiction

■ Acknowledging that the denial of a qualified immunity defense is subject to an interlocutory appeal when the appeal can be decided as a matter of law, *see Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), Vega nonetheless contends that the Defendants are barred from filing the present appeal from the September 2000 ruling denying their motion for summary judgment based on qualified immunity because they did not appeal the September 1999 ruling denying their earlier Rule 12(b)(6) motion to dismiss on the basis of qualified immunity. Vega maintains that the pending appeal, if permitted, would amount to an end-run around the 30–day time requirement in Rule 4 of the Federal Rules of Appellate Procedure, since a defendant who was late in appealing from a Rule 12(b)(6) denial could theoretically obtain a new 30–day clock simply by filing another motion for qualified immunity.

There are three possible approaches to the availability of an interlocutory appeal from a trial court's second denial of a motion asserting an immunity defense: a defendant could be permitted to appeal the second denial (a) only if he did not appeal the first denial, (b) only if he did appeal the first denial, or (c) regardless of whether he appealed the first denial.

If the motion that results in the second denial is virtually a reprise of the motion that was denied the first time, there is a substantial argument for dismissing the appeal of the second motion as an evasion of the appellate timeliness requirement. *See Armstrong v. Texas State Board of Barber Examiners*, 30 F.3d 643, 644 (5th Cir.1994) (appeal from denial of second qualified immunity motion dismissed where "the two motions are substantially the same"); *Taylor v. Carter*, 960 F.2d 763, 764 (8th Cir.1992) (same).

However, the Supreme Court has ruled that an appeal will lie from a rejection of qualified immunity on a motion for summary judgment, notwithstanding a previous unsuccessful appeal from a rejection of the defense on a motion to dismiss at the pleading stage. *Behrens v. Pelletier*, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). The Court rejected the arguments that one "judiciously timed" appeal—either at the motion to dismiss stage or at summary judgment—is sufficient and that the availability of multiple appeals will simply delay the proceedings. The Court reasoned that multiple appeals will often be necessary due to the different posture of the case at the pleading stage and at summary judgment, and that if necessary, "[i]t is well within the supervisory powers of the courts of appeals to establish summary procedures and calendars to weed out frivolous claims." *Id.* at 309–10, 116 S.Ct. 834.

*Behrens* makes clear that an appeal is available from denials of an immunity defense at both the pleading and summary judgment stages, and nothing in that decision suggests that a defendant is required to appeal an initial denial at the pleading stage in order to appeal a subsequent denial on summary judgment. Such an approach would precipitate many needless appeals. *See Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir.1996) (declining to

adopt "rule that would dramatically increase the number of interlocutory appeals at the dismissal stage"). Moreover, even the dissenters in *Behrens*, who favored permitting only one appeal, noted that a defendant could decline to appeal from a denial of their defense at the pleading stage and appeal the subsequent denial at the summary judgment stage. *See Behrens*, 516 U.S. at 323, 116 S.Ct. 834 (Breyer, J., with whom Stevens, J., joins, dissenting).

In the pending case, even though there is some overlap between the contentions made in the Defendants' first and second assertions of the qualified immunity defense, the second motion differs from the first in that it relies on matters developed during discovery. The denial of that motion is appealable, notwithstanding the absence of an appeal at the pleading stage. *See Grant*, 98 F.3d at 120.

## II. Qualified Immunity

■ Government officials are " 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne*, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The qualified immunity defense requires consideration of the clarity of the law establishing the right allegedly violated and whether a reasonable person, acting under the circumstances then confronting a defendant, would have understood that the applicable law was being violated. These inquiries combine to form a standard that the Su-

preme Court has called "objective legal reasonableness," *Behrens*, 516 U.S. at 306, 116 S.Ct. 834; *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727, that is, whether it was objectively reasonable for a defendant to think that the challenged conduct did not violate the plaintiff's clearly established rights. *See Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). We apply this standard to each of Vega's claims, viewing the evidence at this stage from the standpoint of the Plaintiff. *See Salim v. Proulx*, 93 F.3d 86, 90–91 (2d Cir.1996).

Although Vega contends that there are numerous factual issues that preclude summary judgment on the issue of qualified immunity, we adjudicate this appeal on the basis of the facts that are either admitted by Vega, or presented by the Defendants in sworn affidavits or depositions and not contested by any opposing affidavit. The critical undisputed facts are the words and phrases called out by the students during the clustering exercise that Vega invited and permitted to continue.[5]

### A. Academic Freedom Claim

■ It has been clear long before 1994, when the Defendants' termination of Vega occurred, that neither teachers nor students "shed their constitutional rights to freedom of speech ... at the schoolhouse gate." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Although pre–1994 cases had outlined some guideposts concerning the free speech rights of a college professor to express his views in a classroom, *see Dube v. State University of New York*, 900 F.2d

---

**5.** In his deposition, Vega said that "[n]ot all" of the words in the notes made by the resident advisor during the clustering exercise were called out by students, but he has made no claim that numerous vulgar words and phrases, as recorded in the advisor's notes, were not called out, including those that Vega said Admiral Miller found to be disgusting.

587 (2d Cir.1990), and the free speech rights of students to express their views, see *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the available authorities did not settle with certainty the extent to which a college professor could be disciplined for permitting student speech in a classroom to exceed reasonable bounds of discourse. The authority of educational administrators to take actions "reasonably related to legitimate pedagogical concerns," *id.* at 273, 108 S.Ct. 562, leaves room for uncertainty. Two years after the action challenged in this case, the Ninth Circuit observed that "[n]either the Supreme Court nor this Circuit has determined what scope of First Amendment protection is to be given a public college professor's classroom speech." *Cohen,* 92 F.3d at 971.

In the pending case, a college teacher has been disciplined for permitting a classroom exercise, initiated for legitimate pedagogical purposes, to continue to the point and beyond where students are calling out a series of vulgar, sexually explicit words and phrases, many of which the professor writes on the blackboard, either in words or with initials. We must determine whether, in light of then-existing law, college administrators could reasonably believe that they were not violating the teacher's First Amendment rights by disciplining him for such conduct.

Not surprisingly, no decision before 1994 (and none since) had clearly established that dismissal for conduct of the sort that Vega undisputedly took violated a teacher's First Amendment rights. Although qualified immunity is not available simply because the precise conduct at issue has not been previously held unlawful, *see Anderson,* 483 U.S. at 640, 107 S.Ct. 3034, the available precedents that might usefully have guided the Defendants leave the unlawfulness of their action at least un-

clear. *Dube,* much relied on by the Plaintiff, upheld the right of a teacher, in a course on racism, to express the view that Zionism was a form of racism. *See Dube,* 900 F.2d at 589, 598. Protection was accorded despite the offensiveness of the teacher's viewpoint to some students and some members of the community. *Dube* serves as a caution to governmental administrators not to discipline a college teacher for expressing controversial, even offensive, views lest a "pall of orthodoxy" inhibit the free exchange of ideas in the classroom. *See Keyishian,* 385 U.S. at 603, 87 S.Ct. 675. Vega's toleration of the students' shouted vulgarities was far removed from Dube's expression of his political views.

Somewhat more pertinent is the decision of the First Circuit in *Keefe v. Geanakos,* 418 F.2d 359 (1st Cir.1969). A teacher was protected in assigning to a high school senior English class a scholarly article that used the word "mother-fucker" and explained its origin. *See id.* at 360–61. The teacher was careful to offer an alternate assignment to any student who found the assigned material offensive. *See id.* at 361. *Keefe* makes clear that a teacher may not be disciplined simply because a vulgar word is contained and discussed in assigned materials, at least for students of suitable age. A contrary decision would have left teachers vulnerable to discipline for assigning many well regarded literary works. However, the vulgarities Vega permitted to be called out in his classroom were not part of an etymological exploration, nor was the scene in which all of the students but one were yelling their contributions, with two standing on chairs, an academic discussion.

Particularly pertinent is our Circuit's decision in *Silano v. Sag Harbor Union Free School District Board,* 42 F.3d 719 (2d Cir.1994), decided the same year as the

episode at issue here.[6] A teacher was denied protection because of the materials he included in a tenth-grade mathematics class for the purpose of illustrating what he called the "persistence of vision" phenomenon. *See id.* at 721. Of the six 35 mm. film clips he distributed to his students, one portrayed two woman naked above the waist. *See id.* We ruled that the school officials' action in barring the teacher from the classroom was "reasonably related to legitimate pedagogical concerns." *Id.* at 723. We pointed out that "[d]epictions· of bare-chested women were entirely unnecessary to illustrate th[e] scientific phenomenon" that the teacher wished to explain. *Id.* Although Vega's students were high school graduates in a pre-college program and thus two years beyond those in *Sag Harbor,* the students' shouting of vulgarities was as unnecessary to his "clustering" exercise as Silano's film clip was to his explanation of a scientific phenomenon.[7]

Since this episode occurred seven years ago and involves a highly unusual set of circumstances, unlikely to be repeated, we see no reason to rule definitively on whether the Defendants' action was unlawful. For purposes of the pending appeal, we rule only that on the state of the law in 1994, the Defendants could reasonably believe that in disciplining Vega for not exercising professional judgment to terminate the episode, they were not violating his clearly established First Amendment academic freedom rights. Even though no students complained, what students will silently endure is not the measure of what a college must tolerate or what administrators may reasonably think that a college need not tolerate.

### B. Sexual Harassment Policy Claim

■ In considering the sexual harassment policy claim, we encounter an initial difficulty in understanding precisely what Vega contends this claim adds to his First Amendment academic freedom claim. He maintains, and there is no basis for any dispute, that he was terminated because of his conduct in permitting the clustering exercise to continue.[8] Vega's academic freedom claim asserts that the First Amendment prevented the Defendants from disciplining him for this conduct, and we have ruled above that, whether or not that claim is valid, the Defendants were objectively reasonable in believing that it did not. Since the Defendants have a qualified immunity defense from damages liability for a First Amendment academic freedom violation, it does not matter whether they not only thought that Vega's conduct exceeded the proper

6. The decision in *Silano* was rendered a few months after the Defendants terminated Vega. Nevertheless, because it is the most relevant contemporaneous authority, we include it in our consideration of established law because it helpfully indicates how three appellate judges regarded the applicable law at about the time the Defendants in this case are alleged to have been objectively unreasonable in thinking that they were acting lawfully.

7. In denying summary judgment, Judge Cote relied on an English professor's affidavit asserting that permitting and encouraging students to call out anything suggested by a topic is essential to a clustering exercise. This professor's view of the general value of permitting students to call out whatever is suggested by a topic does not create a factual issue as to whether the administrators were objectively reasonable in believing that Vega acted unprofessionally in permitting the clustering exercise on the topic of sex and relationships to continue with the calling out of a string of vulgarities.

8. In a post-argument submission, he asserted that "the real reason for his termination was the in-class brainstorming exercise." Letter from Laura A. Menninger to this Panel 3 n.2 (May 14, 2001).

bounds of a teacher's classroom conduct but also thought that it violated the College's sexual harassment policy. The conduct remains activity for which they may terminate him without incurring damages liability.

■ This is not a case of dual motivation in which a plaintiff contends that adverse action was taken for an impermissible reason, *e.g.*, exercising First Amendment rights by providing information to a radio station, and the defendant contends that the action was taken for a different, permissible reason, *e.g.*, using obscene gestures to correct students. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 281–83 & n. 1, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In such circumstances, if the evidence shows that the impermissible reason was a "motivating factor" of the adverse action, the defendant is liable unless it can show that it would have taken the adverse action in the absence of the impermissible reason. *Id.* at 287, 97 S.Ct. 568. But where, as here, there is only one conduct of the discharged employee that motivates the adverse action, and a defendant has qualified immunity for taking such action, the immunity is not lost even if the defendant thinks that this same conduct also provides an additional reason for the adverse action. To take an extreme example, if a teacher ordered a female student to disrobe in front of a class and was fired because the school administrator reasonably concluded that such conduct was not related to a legitimate pedagogi-

cal purpose, the administrator would not lose qualified immunity just because of an additional belief that the teacher's conduct also violated the school's sexual harassment policy, no matter how impermissibly vague or overbroad that policy was.[9]

■ Even if Vega could show that it is relevant that the Defendants were partially motivated by the additional belief that his conduct violated the College's sexual harassment policy, we are satisfied that it would have been objectively reasonable for them to believe in 1994 that enforcing the policy against Vega did not deny him any constitutional right.[10] In 1996, two years after Vega's termination, the Ninth Circuit held qualified immunity available to college administrators for disciplining a tenured professor for violating a sexual harassment policy that violated the First Amendment. *Cohen*, 92 F.3d at 973. "The legal issues raised in this case are not readily discernable and the appropriate conclusion to each is not so clear that the officials should have known that their actions violated [the professor's] rights." *Id.; see also diLeo v. Greenfield*, 541 F.2d 949, 953 (2d Cir.1976) (regulation permitting termination of teacher "for other due and sufficient cause" not unconstitutionally vague or overbroad as applied to teacher who made comments with sexual connotations to students). Moreover, in view of the vulgarities that Vega permitted to be expressed, no reasonable jury could fail to find that the Defendants would have terminated Vega solely because they considered his

9. Of course, in this example, if the adverse action were motivated in part by a factor unrelated to the teacher's conduct, such as the teacher's race, then dual motivation analysis would be required.

10. In 1994, the College's sexual harassment policy defined sexual harassment as

any unwanted verbal or physical sexual advance, sexually explicit derogatory statements, or sexually discriminatory remarks made by someone in the workplace, which is offensive or objectionable to the recipient or which causes the recipient discomfort or humiliation, or which interferes with the recipient's job performance.

conduct beyond the bounds of proper classroom performance, even if the College had no sexual harassment policy.

### C. Stigma–Plus Claim

Vega contends that he was denied a liberty interest without procedural due process, grounding his alleged interest on an allegation that the Defendants stigmatized him by making defamatory statements in the course of terminating his employment. The Supreme Court has made clear that the right to "notice and an opportunity to be heard" are prerequisites to government action—including employment termination—that places a "person's good name, reputation, honor, or integrity" at stake. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The charges must be made "public" by the government employer, *Brandt v. Board of Cooperative Educational Services,* 820 F.2d 41, 43 (2d Cir.1987), the employee must allege that the charges are false, *id.,* and the alleged defamatory statements must be made "in the course of" terminating the employment, *see Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).[11]

Vega contends that he was stigmatized by both a memo that was placed in his personnel file and by oral statements of some of the Defendants. Whether or not the alleged stigmatizing statements occurred after Vega's termination, as the Defendants contend, or in the course of termination, as he contends, *see Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 144 (2d Cir.1993) (liberty interest implicated only if defamatory statement made in the course of termination of em-

ployment), there was no violation of a federally protected right.

As to the memo, it merely reports Vice–President English's meeting with Vega on August 17, 1994, at which English asked Vega if the resident advisor's notes fairly reflected the content of the clustering exercise and Vega replied that they did. There is nothing false in the memo. As to the oral statements, Vega takes some liberties with the record in recounting them. For example, he contends that DeSimone and English "informed the entire department that Professor Vega was a pornographer and a sexual harasser." Brief for Appellee at 42. The cited record references to English's deposition reveal that "sexual harassing" was used only in a question put to English and not adopted in his answer, and that English accurately referred to the words used in the clustering exercise as "pornographic,"[12] but did not label Vega a pornographer. The only cited remark that appears to be false is Admiral Miller's remark to English that Vega had drawn "dirty pictures." Even if a stigmatization claim could arise from a statement that a plaintiff had put dirty pictures on a blackboard when in fact he had placed dirty words there, there is no evidence that Miller's remark was conveyed to anyone other than his fellow administrator, English. *See White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1064 (2d Cir.1993) (stating that no court had determined whether a stigma-plus claim could be grounded on a statement communicated only within a police department). The "stigma-plus" claim fails for lack of evidence. At a minimum, it was objectively reasonable for the Defendants

---

11. Such a claim is often referred to as "stigma plus." *See, e.g., Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989).

12. *See* Webster's Third New International Dictionary 1767 (1993) (defining "pornographic" as "descriptive or suggestive of lewdness").

to believe that their actions did not violate a clearly established federal right.

## Conclusion

We do not decide whether termination of Vega's employment was an appropriate response to his allowing the classroom exercise to get out of hand, or whether some lesser sanction might have been sufficient. The issue for us is whether, on the undisputed facts of what occurred, the defendants are entitled to the defense of qualified immunity from his claims against them for money damages.[13] For all of the reasons set forth above, the Order of the District Court is reversed, and the case is remanded with directions to dismiss the complaint against the Appellants.

JOSÉ A. CABRANES, Circuit Judge, dissenting.

I respectfully dissent.[1]

The majority opinion, in my view, overlooks the First Amendment's prohibition of vague and overbroad restrictions on speech and undermines its protection of academic freedom as clearly established by the Supreme Court. In finding that the defendants are entitled to qualified immunity, the majority opinion tells us that a college professor can be fired summarily for engaging in a classroom discussion with students when it reaches a topic that some college administrator either believes is in violation of a policy on sexual harassment, that is, upon examination, overbroad and vague, or deems to be beyond the "reasonable bounds of discourse," Majority Opinion at 466. Today the loser is a college teacher in a conservative academic setting who used an "alternative" teaching technique with profane effect. In the future, the major losers are likely to be "traditionalist" and unconventional college teachers, whose method or speech is found offensive by those who usually dominate our institutions of higher learning.[2] The First Amendment, with its "special concern" for academic freedom, *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), must protect all col-

13. Our dissenting colleague vastly overstates our ruling and infers from his overstated version of it a dire threat to academic freedom. We share his appropriately high regard for academic freedom, but believe his apprehension is unfounded. In the first place, we are not adjudicating the lawfulness of Vega's discharge. We are ruling only that the college administrators, based on the state of the law when the discharge occurred in 1994, are protected by qualified immunity from personal liability for damages. Second, our ruling is not based on either the "topic" of Vega's teaching or his teaching "technique," 273 F.3d at 471 (Cabranes, J., dissenting). The case would be entirely different if Vega had been terminated simply because his "topic" was "sex and relationships" or because his "technique" involved a "clustering" exercise in which students were invited to consider the appropriate grouping of relevant words or phrases. Vega was terminated because the administrators reasonably believed that he displayed poor professional judgment in per-

mitting the exercise (which we acknowledge was "initiated for legitimate pedagogical purposes," 273 F.3d at 467) to continue after it had become apparent that the students were persisting in calling out a series of vulgar, sexually explicit words and phrases. Our ruling poses no threat to "'traditionalist' and unconventional college teachers," 273 F.3d at 471 (Cabranes, J., dissenting).

1. I concur in the majority's jurisdictional holding at 465–66 and in its disposition of plaintiff's "stigma-plus" claim at 469–71.

2. The need to protect academic freedom on our college campuses is especially evident in the account of disheartening developments in the recent past given by Alan Charles Kors and Harvey A. Silverglate, commentators from both ends of the political spectrum, in THE SHADOW UNIVERSITY (1998). *See also* DAVID BROMWICH, POLITICS BY OTHER MEANS (1992) (describing the politicization of higher education).

lege teachers, especially in the performance of their most important duty—teaching in the classroom.

My colleagues assert that they do not adjudicate "the lawfulness of Vega's discharge" because they "are ruling only that college administrators, based on the state of the law when the discharge occurred in 1994, are protected by qualified immunity from personal liability for damages." Majority Opinion at 471 n. 13. It is, however, precisely the majority's view of the First Amendment that serves as the basis for its conclusion that the defendants are entitled to qualified immunity. Although "the lawfulness of Vega's discharge" is not specifically decided, the majority opinion does state its interpretation of the law, at least as it was in 1994, and by inference, as it may still be. I dissent because I disagree with the majority's interpretation of the law, as it was in 1994, and as it is today.

### I

From the start, the majority opinion fundamentally misapprehends Vega's two First Amendment claims. Vega's first claim is grounded in the First Amendment's prohibition of vague and overbroad restrictions on speech. Vega claims that he was discharged pursuant to an overbroad and vague college policy on sexual harassment.[3] *Second Amended Complaint* (filed June 26, 1998), ¶ 68. *See Vega v. State Univ. of N.Y. Bd. of Trs.*, 67 F.Supp.2d 324, 341–342 (S.D.N.Y.1999). Vega's second claim is grounded in the First Amendment's protection of academic freedom. *Second Amended Complaint,*

¶ 72. *See Vega v. State Univ. of N.Y. Bd. of Trs.*, 67 F.Supp.2d at 341. He argues that even if the policy is not void for overbreadth and vagueness, his right to academic freedom independently prevents the college from punishing him for his classroom speech—or, more precisely, for permitting certain speech by his students. These two claims are distinct.

Because the majority opinion finds that the defendants are entitled to qualified immunity with respect to Vega's academic freedom claim and that Vega's conduct is the basis "for which [the defendants] may terminate [Vega] without incurring damages liability," Majority Opinion at 469, it "encounter[s] . . . difficulty in understanding precisely what Vega contends [the overbreadth and vagueness] claim adds to his First Amendment academic freedom claim." Majority Opinion at 468. For the majority, the inquiry ends once the defendants have shown that they are entitled to qualified immunity for their actions with respect to one claim. It does not matter to the majority whether Vega was fired because the defendants thought his conduct "exceeded the proper bounds of a teacher's classroom conduct" or because they "thought that it violated the College's sexual harassment policy." Majority Opinion at 468–69. In either case, the majority concludes, the defendants could fire Vega because Vega's conduct was not protected by principles of academic freedom rooted in the First Amendment.

The majority is incorrect. Vega claims that he was fired *because* school administrators decided that his actions violated the college's policy on sexual harassment.

---

**3.** The defendants' shifting claim that Vega was not discharged pursuant to the policy but because of other concerns is irrelevant for purposes of this appeal. If Vega was discharged on account of the policy—which is part of Vega's complaint, *see Second Amended Complaint,* ¶ 59, 60—then he can challenge

the discharge on grounds of overbreadth and vagueness as well as academic freedom. If at trial it were proved that he had not been discharged because of the policy, then he would have to rely solely on his First Amendment right to academic freedom.

Thus, a court considering Vega's lawsuit must determine whether that policy violates the First Amendment's prohibition of overbroad and vague speech restrictions. In these circumstances, the majority's entire discussion on "dual motivation" is, in my view, misleading. Majority Opinion at 468–69. Vega has *two independent* First Amendment claims against the college.[4] Because the college's actions with respect to each of the claims were objectively unreasonable in light of clearly established law, *see Ford v. Moore,* 237 F.3d 156, 162 (2d Cir.2001), the District Court properly denied the defendants qualified immunity and left open the possibility of a trial to determine issues of fact.

## II

It has long been clearly established law that overbroad and vague policies restricting speech on state university campuses violate the First Amendment. *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.,* 385 U.S. 589, 604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *see also UWM Post, Inc. v. Bd. of Regents of the Univ. of Wisc. Sys.,* 774 F.Supp. 1163, 1178–1181 (E.D.Wis.1991); *Doe v. Univ. of Mich.,* 721 F.Supp. 852, 861–867 (E.D.Mich.1989). In *Keyishian,* a law prohibited the employment in a university of anyone who "by word of mouth or writing willfully and deliberately advocates, advises or teaches the doctrine of forceful overthrow of the government." *Keyishian,* 385 U.S. at 599, 87 S.Ct. 675. The Supreme Court found the law unconstitutional because it was "wholly lacking in terms susceptible of objective measurement" and had "the quality of extraordinary ambiguity" such that "[m]en of common intelligence must neces-

sarily guess at its meaning and differ as to its application." *Id.* at 604, 87 S.Ct. 675.

Vega claims, and the defendants do not dispute, that he was fired pursuant to the college's policy on sexual harassment, which Vega argues is as overbroad and vague as the restriction in *Keyishian. Second Amended Complaint,* ¶ 68. *See Vega v. State Univ. of N.Y. Bd. of Trs.,* 67 F.Supp.2d 324, 341–342 (S.D.N.Y.1999). To determine whether a particular policy is overbroad in violation of the First Amendment, we must first decide whether it "reaches a substantial amount of constitutionally protected conduct," *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), or protected speech "judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *see United States v. Rahman,* 189 F.3d 88, 115 (2d Cir.1999).

The college's policy on sexual harassment at issue here was presented in the January 1994 edition of the SUNY Maritime College Employee Handbook (eight months before Vega was fired). It is rather brief. Here is the full text of that policy:

> EVERY EMPLOYEE is entitled to a work environment free from any form of discrimination on the basis of race, creed, color, religion, national origin or sex. Sexual harassment is one form of sex discrimination.
>
> Sexual harassment is any unwanted verbal or physical sexual advance, *sexually explicit derogatory statements, or sexually discriminatory remarks made by someone in the workplace,* which is of-

---

4. There is no doubt that the defendants, persons acting in their official capacity as state college administrators, are part of a university system (the State University of New York) that is a state-actor for purposes of this litigation and subject to the First Amendment. *See Dube v. State University of New York,* 900 F.2d 587, 594 (2d Cir.1990).

fensive or objectionable to the recipient or which causes the recipient discomfort or humiliation, or which interferes with the recipient's job performance.

It may include:

— verbal harassment or abuse

— subtle pressure for sexual activities

— unnecessary touching, patting, or pinching

— leering at a person's body

— constant brushing against a person's body

— demanding sexual favors accompanied by implied or overt threats concerning one's job, performance evaluation, promotion, etc.

— physical assault

Any employee who believes he or she has been sexually harassed should contact:

1. The immediate department supervisor

2. The Director of Personnel

(emphasis added). *See also* Majority Opinion at 469 n. 13. There is no reference to the possible consequences of a violation; to the person who has direct authority to apply the policy; or to the procedures by which any complaint might be resolved or decided.

By defining "sexual harassment" to include, in part, "sexually explicit derogatory statements" or "sexually discriminatory remarks," this sweeping policy forbids a broad class of protected speech. Even limiting "harassment" to speech or conduct which is "offensive or objectionable to the recipient," or causes the recipient to feel "discomfort or humiliation," is inherently vague, dependent for its meaning on the unpredictable and varying sensibilities of different persons. Such a definition inevitably outlaws a substantial amount of protected speech. It is clear that "under our

Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969). The college's policy proscribes speech based upon the listener's subjective feeling of offense, and could thus render as prohibited harassment, in the view of an especially sensitive listener, nearly all speech related to sex. A straightforward application of the policy would allow, for example, the college to punish a student or professor who, in a classroom discussion on the roles of women and men in the military, makes broad generalized statements about the sexes that someone in the class finds discomforting or "offensive." This silencing of discussion is especially troubling when it involves teachers in a university setting because when we "impose [a] straight jacket upon the intellectual leaders in our colleges and universities[, we] imperil the future of our Nation." *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality opinion).

A statute, regulation, or policy is impermissibly vague when it does not allow a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *see Marchi v. Board of Cooperative Educ. Servs. of Albany,* 173 F.3d 469, 480 (2d Cir.), *cert. denied* 528 U.S. 869, 120 S.Ct. 169, 145 L.Ed.2d 143 (1999). Whenever a "vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms." *Grayned,* 408 U.S. at 109, 92 S.Ct. 2294 (alterations and internal quotation marks and citations omitted). The college's policy is impermissibly vague on its face. Even if one interprets the policy

to avoid reaching sexually discriminatory remarks protected under the First Amendment so as to avoid overbreadth, the terms of the policy do not indicate or warn where the boundary between permissible and impermissible speech might be. Limiting "sexually discriminatory" or "sexually derogatory" remarks to those perceived as "offensive," "humiliat[ing]," "objectionable," or "discomfort[ing]" by another person does not provide any objective definition as to what such remarks might be and who, as a final matter, is to define them. Unavoidably, faculty and students alike are left to "guess at [the policy's] meaning and differ as to its application." *Keyishian*, 385 U.S. at 604, 87 S.Ct. 675.

Indeed, it is unclear whether a complaint must be lodged in order to activate the policy, or whether, as in this case, sanctions can be exacted by the administration on its own initiative without any complaint at all. "A vague law impermissibly delegates basic policy matters ... for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108–109, 92 S.Ct. 2294. The college's policy states that sexual harassment grievances may be filed by employees; however, it does not state whether, pursuant to the policy, the college may fire summarily a faculty member without being "afforded opportunity for some kind of a hearing." *Bd. of Regents v. Roth*, 408 U.S. 564, 570 n. 7, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Because the law prohibiting overbroad and vague policies that restrict speech in a classroom was clearly established at the time of Vega's discharge, and the college

policy on sexual harassment was by its terms both overbroad and vague, I would conclude that it was not objectively reasonable for the college to fire Vega pursuant to that policy. Any reasonably competent and well-informed college official, in so much as setting eyes on such a policy, could have recognized that the policy's terms were so sweeping—startlingly sweeping in a context where, unlike a business or industrial setting, hierarchies are blurred and teachers perform their duties under the most general directions and virtually no supervision—that it would have violated not only Vega's First Amendment rights, but also the college's own policies on academic freedom.

The college's policy on academic freedom provides in relevant part that "faculty members may, without limitation, discuss their own subject in the classroom; they may not, however, claim as their right the privilege of discussing in their classroom controversial matter which has no relation to their subject." This college policy substantially tracks the language of the 1940 Statement of Principles on Academic Freedom and Tenure by the American Association of University Professors (AAUP), ACADEMIC FREEDOM AND TENURE 33 (Louis Joughin ed., 1969), an organization founded to promote and protect academic freedom in higher education.[5] *See* WALTER P. METZGER, ACADEMIC FREEDOM IN THE AGE OF THE UNIVERSITY 194 (6th prtg. 1969) (Metzger, the preeminent student of the history of academic freedom in the United States, observes: "To examine the activities and achievements of the AAUP since its establishment is to view the main outlines of the

5. The 1940 Statement, in relevant part, provides

(b) The teacher is entitled to freedom in the classroom in discussing his subject, but he should be careful not to introduce into his

teaching controversial matter which has no relation to his subject.

*See* 1940 Statement of Principles *in* ACADEMIC FREEDOM AND TENURE, Academic Freedom and Tenure 36 (Louis Joughin ed., 1969).

problems of academic freedom in the twentieth century."). The AAUP's 1940 Statement of Principles on Academic Freedom and Tenure has been relied upon as persuasive authority by courts to shed light on, and to resolve, a wide range of cases related to academic freedom and tenure. *See, e.g., Mayberry v. Dees,* 663 F.2d 502, 513 (4th Cir.1981) (quoting from an AAUP report deemed "an authoritative source" on tenure, "[T]he [Association of American Colleges] and the AAUP were the framers of the 1940 Statement of Principles on Academic Freedom and Tenure, the fundamental document on the subject."); *Jimenez v. Almodovar,* 650 F.2d 363, 368 (1st Cir.1981) ("American court decisions [on tenure] are consistent with the 1940 Statement of Principles on Academic Freedom and Tenure widely adopted by institutions of higher education and professional organizations of faculty members."); *Browzin v. Catholic Univ. of Am.,* 527 F.2d 843, 848 & n. 8 (D.C.Cir.1975) ("[The 1940 Statement] represent[s] widely shared norms within the academic community, having achieved acceptance by organizations which represent teachers as well as organizations which represent college administrators and governing boards."); *see generally Gray v. Bd. of Higher Educ., City of New York,* 692 F.2d 901, 907 (2d Cir.1982) ("Certain AAUP policy statements have assisted the courts in the past in resolving a wide range of educational controversies, such as off-campus speech by professors."); *Adamian v. Jacobsen,* 523 F.2d 929, 934 (9th Cir.1975). Since it was the students who uttered the sexually-explicit

terms during a concededly legitimate ten-minute writing exercise in the classroom in 1994, no college administrator in 1994 reasonably could have concluded that *Vega's actions* violated the college's policy on sexual harassment or fell outside the protection of the policy on academic freedom. *See Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (government officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

The majority's reliance upon *diLeo v. Greenfield,* 541 F.2d 949 (2d Cir.1976), Majority Opinion at 469, to support the conclusion that the defendants' actions were objectively reasonable given the state of the law at the time Vega was fired, is misplaced. In that case, we upheld a state statute allowing the discharge of a junior high school teacher "for other due and sufficient cause" and declined to find that the statute was unconstitutionally vague or overbroad.[6] *diLeo,* 541 F.2d at 954. We held in *diLeo* that the teacher "had engaged in a persistent pattern of neglecting his professional duties and harassing and humiliating students." *Id.* at 953. We reached this conclusion after observing that the teacher had met with, and been cautioned by, school administrators for his behavior several times before and that he reasonably knew that the behavior was the cause for the discharge. *Id.* Moreover, we

---

**6.** The statute at issue in *diLeo,* CONN. GEN. STAT. § 10–151(b), provided, in relevant part, that a tenured teacher could only be fired after a hearing in which the Board of Education had to prove that the teacher had demonstrated:

    (1) inefficiency or incompetence;

    (2) insubordination against reasonable rules of the board of education;

    (3) moral misconduct;

    (4) disability, as shown by competent medical evidence;

    (5) elimination of the position to which the teacher was appointed, if no other position exists to which he may be appointed if qualified; or

    (6) other due and sufficient cause

limited the challenged provisions of the statute by construing its vague terms in light of the teaching-specific restrictions in the remainder of the statute and by concluding that "other due and sufficient cause" was limited only to conduct relating to a teacher's professional duties. *Id.* at 954–55.

Indeed, on its facts, *diLeo,* a case decided more than two decades before the episode at issue here, should have alerted the defendants in Vega's case that its actions were *likely* to violate Vega's First Amendment rights. Unlike in *diLeo,* the college administrators here did not meet with Vega or caution him prior to firing him. Furthermore, the vague and overbroad college policy on sexual harassment at issue here is not susceptible to a limiting construction, as was the statute in *diLeo,* because there are no other specific terms to constrain the policy's broad restrictions. The college policy on sexual harassment did not in its own terms limit its sweep to conduct outside the protection of the First Amendment.

The majority also relies on the decision of a panel of the Ninth Circuit in *Cohen v. San Bernardino Valley Coll.,* 92 F.3d 968 (9th Cir.1996), for the notion that a court in 2001 can conclude that it was reasonable for school officials, in 1994, not to know that this policy on sexual harassment applied to a faculty member's classroom work might violate the First Amendment. Majority Opinion at 469. *See Cohen,* 92 F.3d at 971 ("Neither the Supreme Court nor [the Ninth Circuit] has determined what scope of First Amendment protection is to be given a public college professor's classroom speech"). I disagree. Although in determining whether a defendant is entitled to qualified immunity this Court must carefully define the scope of the right assertedly violated so that it would be "sufficiently clear that a reasonable official

would understand that what he is doing violates that right," *Shechter v. Comptroller of the City of New York,* 79 F.3d 265, 270–271 (2d Cir.1996), it has never been required that the right be defined so narrowly as to require precedent that is "on all fours" with the case at hand. *Jeffries v. Harleston,* 21 F.3d 1238, 1248 (2d Cir.), *vacated on other grounds,* 513 U.S. 996, 115 S.Ct. 502, 130 L.Ed.2d 411 (1994). Vague and overbroad speech codes in an academic setting, whether they seek to restrict ideas related to political affiliation, as in *Keyishian,* or speech related to sex, have long been understood to run afoul of the First Amendment. *See UWM Post, Inc. v. Bd. of Regents of the Univ. of Wisc. Sys.,* 774 F.Supp. 1163 (E.D.Wis.1991); *Doe v. Univ. of Mich.,* 721 F.Supp. 852 (E.D.Mich.1989). The defendants failed to realize that their sexual harassment policy was vague and overbroad because of their own inadequate training and judgment, not because the law on the subject was unclear.

On the facts presented by this plaintiff, the defendants' decision to fire the plaintiff based on a vague and overbroad policy on sexual harassment was not objectively reasonable. Accordingly, the defendants were not entitled to qualified immunity on plaintiff's First Amendment claim of vagueness and overbreadth.

### III

By 1990, this Court had "clearly established" that state universities and their administrators were not entitled to qualified immunity when they sanctioned a college professor "based on the content of his *classroom* discourse." *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 598 (2d Cir.1990) (emphasis added). Such sanctions would violate "long-standing and clearly established First Amendment law." *Id.* at 597. In *Dube,* a professor was denied tenure

because university defendants disagreed with the views of his course, entitled "The Politics of Race," which referred to Nazism, South African apartheid, and Zionism as forms of racism. The course spurred controversy on and off the campus. We concluded that retaliation against Dube based on his course teaching was "as a matter of law, objectively *un*reasonable." *Id.* at 598 (emphasis in original). Relying upon principles articulated by the Supreme Court, we held that "it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion ... 'that cast a pall of orthodoxy' over the free exchange of ideas in the classroom." *Id.* at 598 (citing *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)).

The majority dismisses *Dube* on the ground that Vega's "toleration" of the students' "shouted vulgarities" was "far removed from Dube's expression of his political views." Majority Opinion at 467. In *Dube,* however, we did not condition First Amendment protection of academic freedom on the requirement that the speech in question itself be "political" in nature. Nor has the Supreme Court held that the protections of the First Amendment are limited solely to political speech. *See Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) ("All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties"); *Universal City Studios, Inc. v. Corley,* No. 00–9185,

2001 WL 1505495, at *11 (2d Cir. Nov. 28, 2001) (Newman, J.); *cf. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 763, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (prescription drug price information is "speech"). The majority concedes that Vega's discussion in class was "initiated for legitimate pedagogical purposes." Majority Opinion at 467. If the discussion was begun legitimately, then it cannot become illegitimate solely because it reaches content of which college administrators disapprove.[7] *See Mahoney v. Hankin,* 593 F.Supp. 1171, 1174 (S.D.N.Y.1984) (political science professor stated a claim based on academic freedom when college attempted to restrict speech on " 'current controversial college matters' which were curriculum-related."); *see also Kingsville Indep. Sch. Dist. v. Cooper,* 611 F.2d 1109, 1111 (5th Cir.1980) (high school teacher's discussions of slavery and post-Civil War Reconstruction protected by First Amendment despite school administrator's order that "nothing controversial should be discussed in the classroom"); *cf. Martin v. Parrish,* 805 F.2d 583, 584 n. 2 (5th Cir. 1986) (denying professor's claim based on academic freedom and holding that professor's in-class condemnation of students' attitude as "bullshit" was "not germane to the subject matter in his class and had no educational function"). To allow administrators the authority to censor the academic content of a class is to allow "a pall of orthodoxy" to enter into the classroom.[8] *Keyishian,* 385 U.S. at 603, 87 S.Ct. 675.

7. The defendants' action also seems to violate the college's own academic freedom policy, which guarantees to all faculty that they "may, without limitation, discuss their own subject in the classroom," as well as the AAUP's 1940 Statement of Principles on Academic Freedom and Tenure. *See ante* at 475.

8. The fact that Vega is an untenured teacher does not affect the scope of the First Amend-

ment's protection of academic freedom in the classroom. *See Perry v. Sindermann,* 408 U.S. 593, 597–598, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (concluding that "respondent's lack of a contractual or tenure 'right' to re-employment ... is immaterial to his free speech claim. Indeed, twice before, this Court has specifically held that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exer-

The majority finds support for its decision in the fact that, in this case, students were "yelling" and two were "on chairs." Majority Opinion at 468. Let us be clear: It was neither the volume nor the enthusiasm of the students that prompted Vega's dismissal, but rather, in the words of Howard L. English, Jr., the Vice President of Academic Affairs who fired Vega, "[i]t was the *subject matter* and the words [in the classroom] that were elicited" (emphasis added). *Deposition of Howard L. English, Jr.,* April 20, 2000, at 267. It is precisely this admitted censoring of the subject matter of a class discussion that violated Vega's clearly-established First Amendment right to academic freedom.

This right surely has its bounds, but, on the facts before us, Vega did not exceed them. We have held that a school teacher's academic freedom in the classroom is limited to actions that are "reasonably related to legitimate pedagogical concerns." *Silano v. Sag Harbor Bd. of Educ.,* 42 F.3d 719, 723 (2d Cir.1994) (quoting *Hazelwood v. Kuhlmeier,* 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988)). Whether a teacher's action is "reasonably related to legitimate pedagogical concerns" depends in part upon (1) "the age and sophistication of the students," (2) "the relationship between teaching method and valid educational objective," and (3) "the context and manner of the presentation." *Id. See also Ward v. Hickey,*

996 F.2d 448, 452 (1st Cir.1993); *Mailloux v. Kiley,* 448 F.2d 1242 (1st Cir.1971) (per curiam); *Silva v. Univ. of N.H.,* 888 F.Supp. 293 (D.N.H.1994). Applying these principles in *Silano,* we found no protection under the First Amendment for a high school teacher who showed a picture of two topless women to a mathematics class to illustrate a lesson on the phenomenon of "persistence of vision." *Silano,* 42 F.3d at 724.

Applying the same three principles in Vega's case should lead to the conclusion that his activity *is* protected. First, Vega was teaching a class to students who were of college-age maturity, and "we cannot think [that the sexually-explicit terms were] unknown to many students," *Keefe v. Geanakos,* 418 F.2d 359, 361 (1st Cir.1969) (holding that a high school English teacher's discussion of the etymological origins of the word "motherfucker" was protected by First Amendment right to academic freedom). Indeed, it was *the students themselves, not Vega,* who offered the sexually-explicit terms for consideration.

Second, there is no dispute in this case as to whether Vega's pedagogical method was "legitimate" within the meaning of the case law; the majority concedes that the "clustering" technique used by Vega in the classroom at issue here was "initiated for legitimate pedagogical purposes."[9] Majority Opinion at 467.

cise of First and Fourteenth Amendment rights" and citing *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) and *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)). In *Dube,* we denied qualified immunity to university defendants based on their objectively unreasonable action against Dube without regard to the fact that Dube himself was an untenured college teacher. *Dube,* 900 F.2d at 599; *see also Ward v. Hickey,* 996 F.2d 448 (1st Cir.1993) (nontenured teacher). It is true, of course, that tenure is an important means of securing academic freedom for college teachers. *See*

Howard Mumford Jones, *The American Concept of Academic Freedom, in* ACADEMIC FREEDOM AND TENURE 231 (Louis Joughin ed., 1969) ("Tenure . . . is the bulwark of academic freedom"). The importance, however, of tenure to the academic profession's goal of securing protection for academic speech does not suggest or support the proposition that the First Amendment protects only those with tenure.

9. The controversial teaching technique of "clustering" is essentially a "brainstorming" writing exercise in which students choose a writing subject, select words or concepts that

Third, the context and manner of the writing exercise show that Vega did nothing to forfeit the protection of the First Amendment. In this case, the clustering exercise occurred during the last ten minutes of a single one-hour-and-ten-minute class. Vega allowed the students to choose the subject matter for "brainstorming." When the students chose the subject of sex, Vega expanded and tempered it to "sex and relationships." Students began the exercise by calling out non-sexually-explicit terms such as "marriage" and "children," and Vega wrote these on the blackboard. A small number of students then called out sexually-explicit terms. Vega neither encouraged nor actively participated in suggesting those terms. Although he did not immediately end the exercise once students began to use vulgarities, he abbreviated a number of these sexually-explicit terms when writing them on the blackboard. Other sexually-explicit terms he simply did not write. The parties agree that at the end of the exercise he counseled the students against using such terms and expressed disapproval. No student, before, during, or after the exercise, complained. The defendants do not dispute these facts. *Defendants Reply Brief* at 22 ("[T]he State Defendants have taken as true Vega's version of events for purposes of this appeal.").

In sum, the simple fact that sexually-explicit terms were used by students in a ten-minute classroom exercise is not sufficient to show that Vega exceeded the clearly-established bounds of academic freedom protected by the First Amendment.

Considering all of these factors, and taking plaintiff's version of the facts as we are required to do at this stage of the case, *see Salim v. Proulx,* 93 F.3d 86, 90 (2d Cir. 1996), it was objectively unreasonable for the defendants to fire Vega based on the ten-minute clustering exercise. A college teacher's First Amendment right to academic freedom in the classroom was clearly established at the time of Vega's dismissal, and Vega's actions were clearly within the scope of that right.

Accordingly, the defendants are not entitled to qualified immunity on Vega's claim that he was fired in violation of the First Amendment.

\*    \*    \*    \*    \*    \*

In sum, because the law with respect to plaintiff's claims based on infringement of academic freedom and on the unconstitutionally vague and overbroad policy on sexual harassment was clearly established as of 1994, when Vega was fired summarily by college administrators, and because, based on plaintiff's version of the facts, the defendants' actions were objectively unreasonable, I dissent from the reversal of the District Court's order denying qualified immunity to the defendants.

---

relate to that subject, and use these words to frame a topic. *Deposition of Edward Vega,* May 16, 2000, at 58–59. The teacher who leads this exercise refines the answers the students provide as the exercise continues.

*Reply Affidavit of Ian S. MacNiven,* at ¶ 4, 5. This pedagogical technique has no appeal to me, and it may have little appeal to others, but for purposes of this lawsuit it has been conceded to be "legitimate."